## STATE OF CONNECTICUT *v.* JULIAN J. LOCKHART
(SC 17773)

Rogers, C. J., and Palmer, Zarella, McLachlan and Gruendel, Js.

---

Argued December 1, 2009—officially released October 12, 2010

*Richard Emanuel*, special public defender, with whom, on the brief, was *G. Douglas Nash*, special public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, was *Timothy J. Liston*, state's attorney, for the appellee (state).

*Thomas P. Sullivan*, pro hac vice, and *Todd D. Fernow* filed a brief for the Innocence Legal Network as amicus curiae.

*Susan O. Storey*, chief public defender, *Martin Zeldis*, chief of legal services, and *Elizabeth M. Inkster*, senior assistant public defender, filed a brief for the office of the chief public defender as amicus curiae.

*Thomas Ullmann* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

McLACHLAN, J. The defendant, Julian J. Lockhart, was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a (a), felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1) and (3) and larceny in the third degree in violation of General Statutes § 53a-124 (a) (1). On appeal,[1] the defendant argues that: (1) the United States constitution and the constitution of Connecticut require law enforcement agents to record electronically, whenever feasible, custodial interrogations, *Miranda* warn-

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

ings[2] and any resulting statements made by the defendant; and (2) the state violated the defendant's right to remain silent by introducing testimony regarding his refusal to sign a *Miranda* rights acknowledgment card, his refusal to provide a written statement, his termination of an interview with police detectives and his assertion of his right to remain silent. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. In May, 2002, the twenty-two year old victim, Robert Glidden, lived in Wallingford and worked as a machinist in Durham. The victim had posted an advertisement in the newspaper offering to sell his 1989 Ford Mustang GT for approximately $6000.

In May, 2002, the defendant lived in Meriden with his mother, and made a living by selling crack cocaine. On May 9, 2002, the defendant and his friend, Leonard Bunch, went to look at the victim's car. Maria Estrada, a friend of the defendant's mother, agreed to give the defendant and Bunch a ride in exchange for crack cocaine. During the drive, the defendant or Bunch called the victim to make arrangements to meet and to get directions.

The defendant, Bunch and Estrada drove to the home of the victim's parents where they met the victim's mother, Elizabeth Glidden, and followed her down Saw Mill Road to the manufacturing company where the victim was working. Glidden left after introducing the defendant to the victim. After Bunch and the defendant examined the vehicle, the victim took the defendant for a test drive. Bunch and Estrada waited in the parking lot of the manufacturing company for fifteen to thirty minutes, and when the defendant had not returned, began to drive back down Saw Mill Road. As Bunch and

---

[2] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1996).

Estrada were driving, they noticed the victim's vehicle parked on the side of the road. Because neither the defendant nor the victim was in the vehicle, Estrada honked the car horn. Estrada then saw the defendant standing in the woods near the car, waving a stick and telling her to leave. Bunch and Estrada saw the defendant hit the ground with the stick five or six times. Estrada could not see what the defendant was striking because he was standing in tall grass. The defendant told Bunch to leave, and Estrada and Bunch drove away.

The next day, the defendant called Bunch and told him that he had hit the victim repeatedly and had left him in the woods. He asked for a ride so that he could look for his watch, which he had lost on Saw Mill Road. The defendant later borrowed a car from Bunch's friend. On May 11, 2002, the defendant again called Bunch to ask for a ride, stating that he wanted to move the victim's vehicle, which the defendant had parked one block from his mother's house in Meriden. Bunch agreed and later followed the defendant as he moved the victim's vehicle to a commuter lot in Cheshire. Bunch observed the defendant wipe his fingerprints off the vehicle with a towel.

On May 12, 2002, the state police received a call from a truck driver who had seen the victim's vehicle in a news report about the missing victim. He had noticed the victim's vehicle in the commuter lot, and had observed that it did not have a license plate and that its interior appeared to have been damaged by fire. The following day, the victim's body was discovered in the woods on the side of Saw Mill Road. The police recovered the defendant's watch at the crime scene. Following an autopsy, a deputy chief medical examiner for the state concluded that the victim had died as a result of blunt force trauma to the head. On May 13, 2002, after receiving a call from a state police detective, the defendant took a bus from Hartford to New York City.

From there, he went to Georgia, where he lived for more than one year.

On June 6, 2003, the defendant was arrested by Georgia authorities in Decatur, Georgia. Although he provided the authorities with a Georgia driver's license bearing the name Frederick Kelly, they matched his fingerprints to records for Julian Lockhart. On June 18, 2003, two Connecticut state police detectives interviewed the defendant while he awaited extradition. The detectives did not electronically record the interview. The defendant was turned over to the Connecticut state police on July 15, 2003.

The state charged the defendant, by way of information, with one count of murder, one count of felony murder, one count of robbery in the first degree and one count of larceny in the third degree. The defendant entered a plea of not guilty to each count of the information. On April 17, 2006, the defendant filed a motion to suppress the statements he had made to the police while in custody, which the court denied. A jury trial commenced on May 10, 2006, and on June 1, 2006, the jury returned a verdict of guilty as to all counts. Subsequently, the court sentenced the defendant to a total effective term of eighty years incarceration. This appeal followed.

I

The defendant asks us to revisit and overrule our holding in State v. James, 237 Conn. 390, 434, 678 A.2d 1338 (1996), that the due process clause of our state constitution does not require confessions to be recorded in order to be admissible.[3] Specifically, the

___

[3] In James, the defendant had claimed that his right to due process under the constitution of Connecticut was violated by the admission of his *written* confession. State v. James, supra, 237 Conn. 428. Our ruling, however, encompassed all interrogations and confessions, and is therefore applicable to the present case, in which the defendant challenges the admission of the statements he made orally during his interrogation. See id., 434.

defendant argues that the Connecticut constitution requires law enforcement agents, whenever feasible, to record custodial interrogations, *Miranda* warnings and any resulting statements by a defendant. The defendant contends that because the police did not record his interrogation and statements, those statements must be suppressed. In support of his claim, the defendant relies on the due process provisions of article first, §§ 8 and 9, of the constitution of Connecticut,[4] the privilege against self-incrimination, as well as the associated *Miranda* right to consult with counsel prior to and during custodial interrogation, the right to present a defense and the right to confrontation within article first, § 8, of the constitution of Connecticut. The defendant also argues, in the alternative, that this court should exercise its supervisory authority over the administration of justice to establish such a requirement. In response, the state argues that the text and history of the Connecticut constitution, as well as the policy reasons identified in *James*, defeat the defendant's argument. The state also argues that the decisions of appellate courts in other states counsel against such a rule, as only one of the states that has addressed the issue of electronic recording of custodial interrogations since *James* has adopted a recording requirement, which that court has limited to juvenile interrogations. Finally, the state argues that this court has never used its supervisory authority over the administration of justice to impose a rule of criminal procedure upon law enforcement and should not do so now. We conclude that, although there

---

[4] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf . . . . No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

are benefits to be realized by a recording requirement, it is not mandated by our state constitution, and we decline to impose such a requirement pursuant to our supervisory powers.

The following additional facts are relevant to our resolution of this issue. On April 17, 2006, the defendant filed a motion to suppress the statements he had made while in custody on the grounds that they were obtained: (1) without proper advisement and waiver of his *Miranda* rights; (2) in violation of his right to counsel, which had attached by virtue of the extradition proceedings; and (3) in the absence of authority on the part of the officers who were transporting him to issue *Miranda* warnings or to conduct a custodial interrogation. On May 15, 2006, the defendant filed a motion in limine, seeking to preclude the state from introducing any oral statements that he had made while in police custody. The defendant argued that the state, by failing to record the defendant's statement and introducing only portions of the statement, precluded him from offering additional portions of that statement pursuant to § 1-5 (b) of the Connecticut Code of Evidence,[5] without waiving his right to remain silent. The defendant contended that when law enforcement officials fail to record defendants' statements, they potentially preclude defendants from demonstrating the full context of their statements, as permitted by § 1-5 (b) of the Connecticut Code of Evidence, and that if § 1-5 (b) "is not enforced, law enforcement personnel will continue to selectively transcribe the statements of defendants."

Following a hearing, the court denied both of the defendant's motions. The court first observed that, in

[5] Section 1-5 (b) of the Connecticut Code of Evidence provides: "When a statement is introduced by a party, another party may introduce any other part of the statement, whether or not otherwise admissible, that the court determines, considering the context of the first part of the statement, ought in fairness to be considered with it."

*State* v. *Lapointe,* 237 Conn. 694, 735, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996), this court had concluded that there was no constitutional obligation to record interrogations and declined to exercise its supervisory powers in order to create such an obligation. Second, the trial court concluded that the interrogation had not been conducted in violation of the defendant's right to counsel because, pursuant to *State* v. *Pierre,* 277 Conn. 42, 97, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006), the commencement of adversarial proceedings, which would trigger the defendant's sixth amendment right to counsel, had not occurred until the defendant had been presented in court or served with a warrant. Lastly, the court found that the defendant had properly been given his *Miranda* warnings pursuant to a *Miranda* rights card, also known as a blue card, rather than with the customary waiver of rights form. It also found that the defendant implicitly had waived his *Miranda* rights, observing that, pursuant to *State* v. *Barrett,* 205 Conn. 437, 448–49, 534 A.2d 219 (1987), such a waiver need not be explicit. The trial court further found that although the defendant had refused to provide a written statement, he had made admissible oral statements to the police.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct . . . ." (Internal quotation marks omitted.) *State* v. *Stenner,* 281 Conn. 742, 761, 917 A.2d 28, cert. denied, 552 U.S. 883, 128 S. Ct. 290, 169 L. Ed. 2d 139 (2007).

The defendant's claim that our state constitution requires police to record electronically custodial interrogations and statements implicates our duty to interpret the rights and guarantees provided by the Connecticut constitution. See *Moore* v. *Ganim*, 233 Conn. 557, 581, 660 A.2d 742 (1995). We begin our review with the well established principle that "federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). When adjudicating a claim brought pursuant to our own constitution, "our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. . . . In construing the contours of our state constitution, we must exercise our authority with great restraint in pursuit of reaching reasoned and principled results. . . . We must be convinced, therefore, on the basis of a complete review of the evidence, that the recognition of a constitutional right or duty is warranted." (Citations omitted; internal quotation marks omitted.) *Moore* v. *Ganim*, supra, 581. Because the right proposed by the defendant is absent from the plain text of our constitution, we must employ "[t]he analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum . . . ." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 560, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); see also *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 354, 990 A.2d 206 (2010) (*Schaller, J.*, concurring). In *State* v. *Geisler*, supra, 684–85, we set forth six factors to be used in analyzing an independent claim

under this state's constitution: (1) the text of the operative constitutional provisions; (2) related Connecticut precedents; (3) persuasive relevant federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. *State* v. *Michael J.*, 274 Conn. 321, 349–50, 875 A.2d 510 (2005).

As a preliminary matter, we review our decision in *State* v. *James*, supra, 237 Conn. 390. In *James*, the defendant claimed that the due process provision of article first, § 8, of our constitution requires the police, when feasible, to record electronically confessions, interrogations and advisements of *Miranda* rights that occur in places of detention in order for the resulting confession to be admissible at trial. Id., 428. We rejected this argument and concluded, on the basis of the factors enumerated in *Geisler*, that article first, § 8, of the constitution of Connecticut did not require a confession to be recorded as a prerequisite to admissibility. Id., 434. We first acknowledged that "[e]lectronic recording devices are . . . a relatively recent technological advancement, and [therefore] the absence of early historical support for their use in the receipt of confessions by the police is of little relevance to our inquiry." Id., 429. We then noted that although "[o]ther analogous means of verifying the accuracy . . . of confessions and waivers of constitutional rights were available . . . at the time of the adoption of our due process clause," Chief Justice Swift's commentary on the laws of evidence made no reference to a corroboration requirement for confessions to be admissible at trial. Id., citing Z. Swift, A Digest of the Law of Evidence (1810), p. 131.

Having found no authority to suggest that such a requirement existed at common law, we turned to recent decisions of this court, which revealed no cor-

roboration requirement for the existence and voluntariness of confessions, or the waiver of constitutional rights. *State* v. *James*, supra, 237 Conn. 430–31; see *State* v. *Shifflett*, 199 Conn. 718, 733, 508 A.2d 748 (1986) (law does not require defendant to execute written waiver of *Miranda* rights in order for subsequent incriminating statements to be admitted); *State* v. *Whitaker*, 215 Conn. 739, 756–57, 578 A.2d 1031 (1990) (no requirement for corroborative witness to defendant's waiver of *Miranda* rights or requirement that confession be witnessed by someone other than officer taking statement). We concluded that "[r]ather than establishing per se rules of corroboration for the admissibility of confessions, we consistently have allowed the trier of fact to consider the circumstances of the confession, including any lack of corroboration, in determining the weight, if any, to be afforded that particular piece of evidence." *State* v. *James*, supra, 431.

With regard to the decisions of other states, we found that of the states that had considered a similar claim, only two had adopted a recording requirement, and only one of those had adopted the requirement pursuant to the due process provision of its state constitution. Id., 431–32 and n.35; see *Stephan* v. *State*, 711 P.2d 1156, 1159 (Alaska 1985) (electronic recording of confessions is required, where feasible, under Alaska constitution's due process provision); see also *State* v. *Scales*, 518 N.W.2d 587, 592 (Minn. 1994) (enacting electronic recording requirement pursuant to supervisory power).

We then considered the public policies relevant to the adoption of a recording requirement. *State* v. *James*, supra, 237 Conn. 432. Although we acknowledged that a recording requirement is a "desirable investigative practice, which is to be encouraged"; id., 434; we remained confident in the ability of the trial courts to evaluate the credibility and testimony of each witness with regard to what occurred during the interrogation

of a defendant. Id., 433. Moreover, we noted that, in addition to the costs of purchasing the requisite recording equipment, the state would have to bear additional " 'costs,' " such as the risks that a recording requirement might inhibit police from pursuing confessions by constitutionally valid methods and that a defendant might be less willing to speak with police if he or she knew the conversation would be recorded, as well as "the cost of noncompliance with the rule advanced by the defendant, due to negligence or for other reasons, [namely] . . . the loss of otherwise admissible, probative evidence of guilt." Id., 434. Therefore, pursuant to our *Geisler* analysis, we rejected the defendant's claim that the due process clause of our state constitution requires confessions be recorded. Id.; see also *State* v. *Lapointe*, supra, 237 Conn. 735 (rejecting similar claim).

In the present appeal, the defendant asks us to revisit and overrule, in part, *James* and *Lapointe*. We do not lightly overrule our existing precedent. This court repeatedly has acknowledged that because the doctrine of "[s]tare decisis, although not an end in itself, serves the important function of preserving stability and certainty in the law"; (internal quotation marks omitted) *Florestal* v. *Government Employees Ins. Co.*, 236 Conn. 299, 305, 673 A.2d 474 (1996); "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) Id. "Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and . . . is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Internal quotation marks omit-

ted.) *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494, 923 A.2d 657 (2007).

Turning to the present claim, we first consider "persuasive relevant federal precedents . . . ." (Internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 212, 833 A.2d 363 (2003). As the defendant concedes, and our research reveals, there is no federal precedent in support of the proposition that the federal constitution imposes a recording requirement.[6] The federal Courts of Appeal that have considered a similar claim have uniformly rejected it.[7]

---

[6] Our conclusion that federal precedent does not support a mandatory recording requirement is dispositive of the defendant's claim that the fifth, sixth and fourteenth amendments to the United States constitution require that all interrogations, advisement of *Miranda* rights and resulting statements made by the defendant be recorded. Ordinarily, we would not consider this claim because the defendant has failed to provide an analysis separate from his state constitutional claim. Because the federal constitutional guarantees always serve as a floor below which we cannot go, however, our analysis of the defendant's state claim logically includes consideration of any federal claim the defendant may have raised. See *State* v. *Ledbetter*, supra, 275 Conn. 560.

[7] See, e.g., *United States* v. *Meadows*, 571 F.3d 131, 147 (1st Cir.) ("no federal constitutional right to have one's custodial interrogation recorded"), cert. denied, 558 U.S. 1018, 130 S. Ct. 569, 175 L. Ed. 2d 394 (2009); *United States* v. *Tykarsky*, 446 F.3d 458, 477 (3d Cir. 2006) ("[w]hatever the merits of the policy arguments in favor of requiring the recording of interrogations may be, it is clear that such recording is not mandated by the United States [c]onstitution"); *United States* v. *Williams*, 429 F.3d 767, 772 (8th Cir. 2005) (constitution does not mandate that police record advisement and waiver of *Miranda* rights); *United States* v. *Cardenas*, 410 F.3d 287, 296 (5th Cir. 2005) ("[n]either this court nor the Supreme Court . . . has ever held that such a requirement is necessary to comply with the [f]ifth [a]mendment's protection against self-incrimination"); *United States* v. *Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004) (*Miranda* does not require electronic recording of all interrogations), cert. denied, 544 U.S. 968, 125 S. Ct. 1750, 161 L. Ed. 2d 614 (2005); *United States* v. *Torres-Galindo*, 206 F.3d 136, 144 (1st Cir. 2000) (no merit to defendant's claim that fifth amendment rights were violated by law enforcement's practice of not recording confessions); *Trice* v. *Ward*, 196 F.3d 1151, 1170 (10th Cir. 1999) (no Supreme Court precedent or any other court precedent to support defendant's argument that police were required to electronically record entire interrogation), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000); *United States*

The lack of support for this claim under the federal constitution is relevant to our consideration of the text of the operative state constitutional provisions as well as related Connecticut precedent. See *State* v. *McKenzie-Adams*, 281 Conn. 486, 511, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). We consider these facts together because analysis of the text of our constitution necessarily includes our prior interpretations of the breadth of those constitutional provisions. On the basis of the text alone, none of the provisions on which the defendant relies provide support for a recording requirement. See footnote 4 of this opinion. More specifically, the defendant relies first on article first, §§ 8 and 9, of the constitution of Connecticut, which we have construed to guarantee the citizens of Connecticut due process of law. See *State* v. *Rizzo*, supra, 213. The due process clauses of the state and the federal[8] constitutions are virtually identical. See *State* v. *Ledbetter*, supra, 275 Conn. 562. Although we

---

v. *Toscano-Padilla*, Court of Appeals, Docket No. 92-30247, 1993 U.S. App. LEXIS 15411, *5 (9th Cir. June 16, 1993) (failure to record interrogation does not invalidate information gained from interrogation, mandate suppression or violate due process); *United States* v. *Short*, 947 F.2d 1445, 1451 (10th Cir. 1991) (district court properly denied defendant's motion to suppress statements grounded on failure of police to record conversation), cert. denied, 503 U.S. 989, 112 S. Ct. 1680, 118 L. Ed. 2d 397 (1992); *United States* v. *Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) ("no constitutional requirement that confessions be recorded by any particular means"); *United States* v. *Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977) (no authority to support defendant's claim that testimony from law enforcement officer should have been suppressed because interrogation was not recorded); see also R. Iraola, "The Electronic Recording of Criminal Interrogations," 40 U. Rich. L. Rev. 463, 471 (2006) ("[t]he federal courts uniformly have rejected the argument that the [c]onstitution mandates, as a matter of due process, that a defendant's confession be electronically recorded").

[8] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

have stated that this similarity "neither precludes nor favors a determination that [the state constitutional provisions] impose any burden higher than the federal constitution"; *State* v. *Rizzo*, supra, 213; we have also concluded, in construing the due process clause in article first, § 8, of our state constitution that the "similarity between the two provisions . . . support[s] a common source and, thus, a common interpretation of the provisions." (Citations omitted.) *State* v. *Ledbetter*, supra, 562.

With respect to the privilege against self-incrimination within article first, § 8, of the Connecticut constitution, we have declined to construe this provision more broadly than the right provided in the fifth amendment to the United States constitution. *State* v. *Asherman*, 193 Conn. 695, 711–15, 478 A.2d 227 (1984) (reviewing history and common-law origins of right against self-incrimination in article first, § 8, of constitution of Connecticut and rejecting defendant's argument for construing right more broadly than federal provision), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); accord *State* v. *Castonguay*, 218 Conn. 486, 496, 590 A.2d 901 (1991) (declining to depart from *Asherman*).

The defendant also contends that the right to counsel as guaranteed by our state constitution, mandates that all custodial interrogations be recorded electronically. Because the defendant invokes the right to counsel safeguarded by *Miranda*, that is, his "right to consult with counsel prior to and during custodial interrogation," he appears to rely on our state counterpart to the fifth amendment right to counsel.[9] With respect to

---

[9] Article first, § 8, of the state constitution; see footnote 4 of this opinion; safeguards, inter alia, the right to counsel and has its counterpart in the rights to counsel guaranteed by the fifth and sixth amendments to the federal constitution. The United States Supreme Court has explained that the sixth amendment right to counsel is analytically distinct from the fifth amendment right created by *Miranda*. *Rhode Island* v. *Innis*, 446 U.S. 291, 300 n.4, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). In his motion to suppress the statements

the "*Miranda* right to consult with counsel," we inquire

he had made while in custody, the defendant argued that the statements were obtained in violation of *Miranda,* and also that they were "obtained in violation of [his] right to counsel because his right to counsel had already attached due to the initiation of adversary judicial proceedings in Georgia, namely extradition proceedings . . . ." In making this claim, the defendant appears to have relied on the state constitutional right to counsel to the extent that it corresponds with *both* his fifth and sixth amendment rights to counsel. That is, by invoking *Miranda,* the defendant signaled that he was asserting a claim under the state counterpart to the fifth amendment. See *Montejo* v. *Louisiana,* 556 U.S. 778, 795, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009) ("the doctrine established by *Miranda* . . . is designed to protect [f]ifth [a]mendment, not [s]ixth [a]mendment, rights"). In asserting that his right to counsel had attached because adversary proceedings already had commenced, the defendant suggested that he also relied on our state counterpart to his sixth amendment right to counsel, which, unlike the fifth amendment right to counsel, attaches only upon the commencement of formal legal proceedings. See *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972) (sixth amendment right to counsel attaches only "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"); *State* v. *Stenner,* supra, 281 Conn. 762, 766 (right to counsel under state constitution triggered at same time as right to counsel afforded by sixth amendment).

On appeal, however, the defendant appears to rely solely on the state constitutional right to counsel insofar as it safeguards his *Miranda* right to consult with counsel prior to and during custodial police interrogation. In other words, the defendant relies on the state constitutional right to counsel that corresponds to the fifth amendment right to counsel. Accordingly, we address the merits of the defendant's claim that his right to counsel derived from the state counterpart to the fifth amendment right to counsel mandates a recording requirement.

To the extent that the defendant's argument on appeal *could* be construed as raising a claim pursuant to the state constitutional right to counsel that corresponds to the sixth amendment right to counsel, that claim would be unavailing. The trial court properly concluded that the defendant's sixth amendment right to counsel had not attached at the time that the defendant made the statements because adversarial proceedings had not begun until the defendant had been presented in court. Although the defendant did not file a motion for reconsideration or a motion for articulation following the court's ruling, his claim would be reviewable pursuant to *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because the record is adequate for review and the claim is of constitutional magnitude. As we already have stated, however, the trial court properly concluded that the sixth amendment right to counsel had not yet attached. See *Kirby* v. *Illinois,* supra, 406 U.S. 689; *State* v. *Stenner,* supra, 281 Conn. 766.

whether the text of the due process clause of article first, § 8, of the constitution of Connecticut and the right to *Miranda* warnings that we have associated with that provision, or our related precedent, provide support for the defendant's proposed rule. "Although the *Miranda* warnings were originally effective in state prosecutions only because they were a component of due process of law under the fourteenth amendment . . . they have also come to have independent significance under [article first, § 8, of] our state constitution." (Internal quotation marks omitted.) *State* v. *Medina,* 228 Conn. 281, 288, 636 A.2d 351 (1994), quoting *State* v. *Ferrell,* 191 Conn. 37, 41, 463 A.2d 573 (1983); see also *State* v. *Barrett,* supra, 205 Conn. 447 (*Miranda* warnings are "independently required under the due process clause of article first, § 8, of the Connecticut constitution"). The defendant relies on two cases in which we have held that the due process clause of the Connecticut constitution provides protections beyond those guaranteed by the federal constitution with regard to *Miranda* rights for custodial suspects. Specifically, the defendant relies on *State* v. *Ferrell,* supra, 41–42, which held that, under article first, § 8, of our state constitution, police may not testify regarding statements that they overheard while the defendant, who was in custody, was speaking with his attorney, and *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988), which concluded that the state constitution requires police to inform a suspect of "timely efforts by counsel to [provide] pertinent legal assistance." Neither *Ferrell, Stoddard,* nor any other authority that we have found, however, indicates that our state constitution imposes greater protections with regard to the advisement of *Miranda* rights or requires additional corroboration for admission of testimony describing such an advisement. Our case law, therefore, does not support the defendant's claim that the right to counsel under the state constitution mandates a recording requirement.

The defendant also relies on the right to present a defense encompassed in article first, § 8, of the constitution of Connecticut. Although there are slight textual differences between the state provision and its federal counterpart in the sixth amendment to the United States constitution, we have rejected the assertion that this difference has any practical effect on the parameters of the right to compulsory process. *State* v. *Estrella*, 277 Conn. 458, 488–49 and n.19, 893 A.2d 348 (2006).

Finally, with respect to the right to confrontation within article first, § 8, of our state constitution, its language is nearly identical to the confrontation clause in the sixth amendment to the United States constitution. The provisions have a shared genesis in the common law. See *Crawford* v. *Washington*, 541 U.S. 36, 43, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ("[t]he founding generation's immediate source of the concept [of the right of confrontation] . . . was the common law"); *State* v. *Torello*, 103 Conn. 511, 513, 131 A. 429 (1925) (purpose of confrontation clause in state constitution was "to mark, preserve, protect and perpetuate a right existing under the common law"). Moreover, we have acknowledged that the principles of interpretation for applying these clauses are identical. *State* v. *Gaetano*, 96 Conn. 306, 310, 114 A. 82 (1921). Therefore, we are not convinced that we should, in this context, construe the confrontation clause of our state constitution to provide greater protections than its federal counterpart.

Accordingly, because the text of the provisions on which the defendant relies makes no reference to a corroboration requirement for the admissibility of confessions and because, according to our case law, those provisions do not provide broader protections than their federal counterparts, these factors do not support the defendant's claim that a recording requirement is mandated by article first, §§ 8 and 9, of the constitution of Connecticut.

The fourth *Geisler* factor, a historical approach that examines the intent of our constitutional forefathers, also provides no support for the defendant's claim. See *State* v. *Rizzo*, supra, 266 Conn. 212–13. The defendant has failed to identify any persuasive evidence of the intent of the authors of our constitution with regard to a version of a recording requirement for custodial interrogations. As we noted in *James*, "Chief Justice Swift's commentary on the laws of evidence does not indicate that any form of corroboration of the existence and circumstances of statements made by criminal defendants to police traditionally was required in order for such statements to be admissible at trial . . . ." *State* v. *James*, supra, 237 Conn. 429. The defendant, placing great emphasis on our reference to police, argues that the historical record can be viewed as supporting the defendant's claim because, according to the defendant, there were no police in early or colonial Connecticut, including during the time of Chief Justice Swift's writing on the laws of evidence. We also noted in *James*, however, that Chief Justice Swift wrote that "[i]t is a settled rule of common law, that in prosecutions for crimes, the voluntary confession of a prisoner, made to a private person or a magistrate, may be given in evidence against him; and if proved by legal testimony, *though uncorroborated by any other evidence*, is sufficient to convict him . . . ." (Internal quotation marks omitted.) Id., 429–30, quoting Z. Swift, supra, p. 131. Accordingly, we find the defendant's argument unpersuasive.

This fifth *Geisler* factor requires us to examine the persuasive precedents of other state courts. See *State* v. *Rizzo*, supra, 266 Conn. 214. Virtually every state that has considered an argument similar to the defendant's claim has concluded that due process does not require the recording of custodial interrogations.[10] Those states

---

[10] Those states are: Alabama; Arizona; Arkansas; California; Colorado; Florida; Georgia; Hawaii; Idaho; Illinois; Indiana; Iowa; Kansas; Kentucky;

Louisiana; Maine; Maryland; Massachusetts; Michigan; Mississippi; Missouri; Montana; Nevada; New Hampshire; New Jersey; New York; North Carolina; North Dakota; Ohio; Oklahoma; Pennsylvania; Tennessee; Utah; Vermont; Washington; West Virginia and Wyoming. See, e.g., *Starks* v. *State*, 594 So. 2d 187, 196 (Ala. Crim. App. 1991) (unrecorded custodial interrogations admissible if voluntariness established), cert. denied, 1992 Ala. LEXIS 217 (February 14, 1992); *State* v. *Jones*, 203 Ariz. 1, 7, 49 P.3d 273 (2002) (defendant's unrecorded statements made during custodial interrogation admissible); *Clark* v. *State*, 374 Ark. 292, 302, 287 S.W.3d 567 (2008) (no constitutional right to recordation under due process clause of state constitution); *People* v. *Gurule*, 28 Cal. 4th 557, 603, 51 P.3d 224, 123 Cal. Rptr. 2d 345 (2002) (due process clause does not require recordings of all interrogations and *Miranda* warnings in order to determine voluntariness), cert. denied, 538 U.S. 964, 123 S. Ct. 1754, 155 L. Ed. 2d 517 (2003); *People* v. *Holt*, 15 Cal. 4th 619, 664, 937 P.2d 213, 63 Cal. Rptr. 2d 782 (court-made exclusionary rule for unrecorded interrogations would violate state constitution), cert. denied, 522 U.S. 1017, 118 S. Ct. 606, 139 L. Ed. 2d 493 (1997); *People* v. *Raibon*, 843 P.2d 46, 49 (Colo. App. 1992) (court will not create mandatory recording requirement in absence of legislative action because doing so would constitute "judicial fiat"), cert. denied, 1993 Colo. LEXIS 15 (January 11, 1993); *State* v. *DuPont*, 659 So. 2d 405, 408 (Fla. App. 1995) (trial court improperly concluded that police failure to record interview violated defendant's right to due process), cert. denied, 517 U.S. 1190, 116 S. Ct. 1679, 134 L. Ed. 2d 782 (1996); *Coleman* v. *State*, 189 Ga. App. 366, 375 S.E.2d 663 (1988) (failure to record defendant's custodial statement did not violate right to counsel, right against self-incrimination, right to fair trial or right to due process under state constitution); *State* v. *Kekona*, 77 Haw. 403, 408–409, 886 P.2d 740 (1994) (due process clause of state constitution does not require electronic recording of custodial statements); *State* v. *Rhoades*, 121 Idaho 63, 73, 822 P.2d 960 (1991) (state due process clause does not require electronic recording of statements made in custody); *People* v. *Pecoraro*, 175 Ill. 2d 294, 318, 677 N.E.2d 875 (failure to record defendant's custodial interrogation not violative of state due process clause), cert. denied, 522 U.S. 875, 118 S. Ct. 183, 139 L. Ed. 2d 131 (1997); *Stoker* v. *State*, 692 N.E.2d 1386, 1390 (Ind. App. 1998) (state constitution does not require law enforcement officers to record custodial interrogations); *State* v. *Morgan*, 559 N.W.2d 603, 609 (Iowa 1997) (recording of interrogations not mandated by state due process clause); *State* v. *Speed*, 265 Kan. 26, 38, 961 P.2d 13 (1998) (recording of interrogation not necessary for statements to be admissible); *Brashars* v. *Commonwealth*, 25 S.W.3d 58, 60–61 (Ky. 2000) (recording of confessions not necessary under state due process clause), cert. denied, 531 U.S. 1100, 121 S. Ct. 834, 148 L. Ed. 2d 715 (2001); *State* v. *Robertson*, 712 So. 2d 8, 32 (La.) (no due process requirement that statement given to police be recorded), cert. denied, 525 U.S. 882, 119 S. Ct. 190, 142 L. Ed. 2d 155 (1988); *State* v. *Buzzell*, 617 A.2d 1016, 1018–19 (Me. 1992) (rule requiring recording of custodial interrogations not necessary to ensure fair trial and not required under state due process clause); *Baynor* v. *State*, 355 Md. 726, 738–40, 736 A.2d 325 (1999) (recording of custodial interrogations not required for trier of fact to determine whether confession was

have followed a number of different rationales, many of which we find persuasive. We highlight the decisions that most inform our analysis.

In rejecting the argument that the due process provision of their state constitution mandates a recording

voluntary); *Commonwealth* v. *Diaz*, 422 Mass. 269, 273, 661 N.E.2d 1326 (1996) (declining to adopt rule that unrecorded custodial interrogations are inadmissible); *People* v. *Fike*, 228 Mich. App. 178, 183, 577 N.W.2d 903 (1998) (due process provision of Michigan constitution does not require police to record interrogations), appeal denied, 590 N.W.2d 64 (Mich. 1999); *Williams* v. *State*, 522 So. 2d 201, 208 (Miss. 1988) (no federal or state requirement that confessions be recorded); *State* v. *Blair*, 298 S.W.3d 38, 51 (Mo. App. 2009) (no constitutional requirement that law enforcement record interrogations); *State* v. *Grey*, 274 Mont. 206, 213, 907 P.2d 951 (1995) (police do not need to electronically record defendant's advisement or waiver of *Miranda* rights); *Jimenez* v. *State*, 105 Nev. 337, 341, 775 P.2d 694 (1989) (concern with regard to lack of recording is reliability of officers' testimony, not constitutional violation); *State* v. *Barnett*, 147 N.H. 334, 337, 789 A.2d 629 (2001) (due process does not require recording of custodial interrogations); *State* v. *Cook*, 179 N.J. 533, 559, 847 A.2d 530 (2004) (due process clause of state constitution does not require recording of all custodial interrogations); *People* v. *Falkenstein*, 288 App. Div. 2d 922, 923, 732 N.Y.S.2d 817 (2001) (no federal or state constitutional requirement that interrogations and confessions be electronically recorded), appeal denied, 97 N.Y.2d 704, 765 N.E.2d 307, 739 N.Y.S.2d 104 (2002); *State* v. *Thibodeaux*, 341 N.C. 53, 61, 459 S.E.2d 501 (1995) (failure of law enforcement officers to electronically record custodial confessions did not violate due process clauses of state and federal constitutions); *State* v. *Goebel*, 725 N.W.2d 578, 584 (N.D. 2007) (criminal defendants have no right under state constitution to electronic recording of custodial interrogations); *State* v. *Smith*, 80 Ohio St. 3d 89, 106, 684 N.E.2d 668 (1997) (neither state nor federal constitution mandates electronic recording of police interviews), cert. denied, 523 U.S. 1125, 118 S. Ct. 1811, 140 L. Ed. 2d 949 (1998); *Chambers* v. *State*, 724 P.2d 776, 779 (Okla. Crim. App. 1986) (unrecorded confession is admissible); *Commonwealth* v. *Craft*, 447 Pa. Super. 371, 377–78, 669 A.2d 394 (1995) (custodial interrogations do not need to be recorded to satisfy state constitution); *State* v. *Godsey*, 60 S.W.3d 759, 771 (Tenn. 2001) (neither state nor federal constitution mandates electronic recording of interrogations); *State* v. *Villarreal*, 889 P.2d 419, 427 (Utah 1995) (contemporaneous recording of confession is not mandated by Utah constitution); *State* v. *Gorton*, 149 Vt. 602, 605–606, 548 A.2d 419 (1988) (state constitution does not mandate recording of suspect's statements); *State* v. *Spurgeon*, 63 Wn. App. 503, 508, 820 P.2d 960 (1991) (Washington constitution does not require electronic recording of custodial interrogations), review denied, 118 Wn. 2d 1024, 827 P.2d 1393 (1992); *State* v. *Williams*, 190 W. Va. 538, 543, 438 S.E.2d 881 (1993) (due process clause of state constitution does not include duty of police to electronically record

requirement, a number of courts have relied on the fact that there is a procedure already in place to determine if a confession is voluntary and therefore admissible. The Supreme Court of Kentucky reasoned that the issue of whether the due process clause of their state constitution mandated a recording requirement implicated the "determinations of reliability traditionally made by trial courts . . . . Due process inquiries require us to assess '[t]he risk of an erroneous deprivation of [liberty] as a consequence of the . . . procedures used.'" *Brashars* v. *Commonwealth*, 25 S.W.3d 58, 62 (Ky. 2000), cert. denied, 531 U.S. 1100, 121 S. Ct. 834, 148 L. Ed. 2d 715 (2001). Noting that trial courts commonly resolve factual disputes and determine, without independent corroboration, issues such as whether the police had the requisite reasonable suspicion necessary to detain a defendant, the court concluded: "[W]e disagree with the [defendant's] contention that fundamental fairness cannot be ensured by [the] trial court's resolution of factual disputes regarding custodial interrogations on the basis of testimony from the persons involved." Id. The Supreme Court of Hawaii used a similar rationale in *State* v. *Kekona*, 77 Haw. 403, 407–408, 886 P.2d 740 (1994), in which the defendant had argued that the state was required to record his custodial interrogation because the recording was necessary to determine whether he validly waived his constitutional rights. The court rejected this claim, concluding that the state's failure to record the interrogation was an issue relating to the credibility of the police and the defendant—which is to be determined by the trial court, rather than a procedure that "was so detrimental to [the defendant's] defense that it necessarily resulted in [an] unfair trial." Id., 409; see also *Starks* v. *State*, 594

custodial interrogations); *State* v. *Evans*, 944 P.2d 1120, 1128 (Wyo. 1997) (no requirement that interviews and interrogations must be electronically recorded, rather prosecution must provide evidence sufficient for court to determine question of voluntariness).

So. 2d 187, 196 (Ala. Crim. App. 1991) (unrecorded custodial interrogations admissible if voluntariness is adequately established), cert. denied, 1992 Ala. LEXIS 217 (February 14, 1992); *State* v. *Nicholson,* 174 W. Va. 573, 577, 328 S.E.2d 180 (1985) (recognizing merits of recording requirement but concluding that "on balance, such a requirement is impractical logistically [and] unnecessary given other protections that our system of interviewing suspects already provides"). We find these decisions persuasive because, as we stated in *James,* "we are not prepared to accept the fundamental premise of the defendant's argument that reliance on the trial court to resolve factual issues from the testimony of persons familiar with the events at issue, is, in this context, unacceptable as measured by the flexible concepts of due process. We are not persuaded that determinations of admissibility traditionally made by trial courts are inherently untrustworthy or that independent corroboration of otherwise competent testimonial or documentary evidence regarding the existence and voluntariness of a confession is necessary to comport with constitutional due process requirements." *State* v. *James,* supra, 237 Conn. 433.

In light of our conclusion that the similarities between the due process provisions of our state constitution and the federal constitution support a common interpretation; *State* v. *Ledbetter,* supra, 275 Conn. 562; we also find persuasive decisions concluding that a recording requirement is not mandated by a state due process clause because the protections of that clause mirror those of the federal counterpart. In rejecting the defendant's argument that the due process clause of the Kentucky constitution mandated a recording requirement, the Supreme Court of Kentucky noted that it "has never held that the procedural due process protections of [the state constitution] extend beyond the protections" of the federal constitution. *Brashars* v. *Commonwealth,*

supra, 25 S.W.3d 61; see *Clark* v. *State*, 374 Ark. 292, 302, 287 S.W.3d 567 (2008) (declining to find constitutional right to recordation in absence of evidence that court has viewed admissibility determinations for custodial interrogations more rigorously than federal courts); *People* v. *Holt*, 15 Cal. 4th 619, 664, 937 P.2d 21, 63 Cal. Rptr. 2d 782 (1997) ("we are aware of nothing in the language or history of the California constitutional due process provisions which would support a construction of that charter which mandates a more stringent standard than that of the [f]ourteenth [a]mendment [to the United States constitution]").

Finally, we find persuasive the reasoning of courts that have determined that, where a recording requirement is not mandated by the state constitution, the legislature is better suited to decide whether to establish a recording policy. The Supreme Court of Vermont, for example, concluded that "[t]he most appropriate means of prescribing rules to augment citizens' due process rights is through legislation. . . . In the absence of legislation, we do not believe it appropriate to require, by judicial fiat, that all statements taken of a person in custody be tape-recorded." (Citation omitted.) *State* v. *Gorton*, 149 Vt. 602, 606, 548 A.2d 419 (1988). The Supreme Court of Tennessee expressed a similar view, reasoning that because historically, "[t]he determination of public policy is primarily a function of the legislature . . . the issue of electronically recording custodial interrogations is one more properly directed to the General Assembly." (Citations omitted; internal quotation marks omitted.) *State* v. *Godsey*, 60 S.W.3d 759, 772 (Tenn. 2001); see also *People* v. *Raibon*, 843 P.2d 46, 49 (Colo. App. 1992) ("[w]e decline . . . to mold our particular view of better practice into a constitutional mandate which would restrict the actions of law enforcement agents in all cases"), cert. denied, 1993 Colo. LEXIS 15 (January 11, 1993); *State* v. *Grey*,

274 Mont. 206, 213–14, 907 P.2d 951 (1995) ("[a]lthough [recording interrogations] may be the better practice and would help assure that the accused receives a constitutionally adequate *Miranda* warning while, at the same time, enhancing the prosecution's ability to meet its burden to prove voluntariness, we leave the imposition of any such procedural requirement to the legislature and to individual law enforcement agencies"). This judicial restraint is consistent with our own well established precedent. See *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 715, 802 A.2d 731 (2002) ("primary responsibility for formulating public policy resides in the legislature"); see also *State* v. *Peters*, 287 Conn. 82, 97–98, 946 A.2d 1231 (2008) (where pro rata reduction is not required by federal medicaid law, determination of whether to provide reduction is policy matter more appropriately addressed by legislature).

Conversely, *only* the Supreme Court of Alaska has concluded that electronic recording is mandated by the due process clause of its state constitution. In *Stephan* v. *State*, supra, 711 P.2d 1159, the court concluded that all custodial interrogations must be electronically recorded whenever feasible, noting that the United States constitution imposes a "heavy burden"; id., 1160; when a defendant claims that his confession is involuntary. The court observed that "[t]he contents of an interrogation are obviously material in determining the voluntariness of a confession"; id., 1161; and reasoned that "recording, in such circumstances, is now a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." Id., 1159–60.

Three other courts have established a recording requirement, in some circumstances, pursuant to their supervisory powers. In *State* v. *Scales*, supra, 518 N.W.2d 591–92, the Minnesota Supreme Court

expressed frustration that law enforcement officials had failed to respond to its admonitions, articulated in two previous cases, that electronic recordings should be used to preserve custodial interrogations. See *State* v. *Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991) (urging "law enforcement professionals use [the] technological means at their disposal to fully preserve those conversations and events preceding the actual interrogation" and warning that "[l]aw enforcement personnel and prosecutors may expect that [the] court will look with great disfavor upon any further refusal to heed these admonitions"); *State* v. *Robinson*, 427 N.W.2d 217, 224 n.5 (Minn. 1988) ("recordation of all pre-statement conversations would afford the reviewing court an objective record upon which to rule, rather than one based upon self-serving or subjective assertions of the principals involved"). Notably, the court did not consider whether the due process clause of the Minnesota constitution mandated a recording requirement. *State* v. *Scales*, supra, 592. Similarly, the Supreme Court of Wisconsin imposed a recording requirement for custodial interrogations pursuant to its supervisory power, but limited that rule to the interrogation of juveniles. *In re Jerrell C.J.*, 283 Wis. 2d 145, 172, 699 N.W.2d 110 (2005).

In *State* v. *Cook*, 179 N.J. 533, 847 A.2d 530 (2004), the Supreme Court of New Jersey took yet another route. The court first rejected the defendant's argument that due process requires the recording of all custodial interrogations, stating "[b]ecause there is otherwise fair-minded disagreement concerning the appropriateness of imposing a sweeping requirement of electronic [recording] of custodial statements we hold that [the] defendant's point of error is not of constitutional dimension." (Internal quotation marks omitted.) Id., 559. The court then established a committee to study electronic recording of custodial interrogations and to make recommendations regarding a recordation rule; id., 562;

and pursuant to that committee's recommendations, exercised its supervisory authority to establish a rule requiring electronic recording of all homicides and numerous other felonies. N.J. Court Rules 3:17.[11] These cases, however, provide little support for the defendant's proposed rule in light of more persuasive analysis from other states concluding that the procedures already used to prevent admission of involuntary confessions satisfy a state due process clause that, in these circumstances, offers no greater protections than its federal counterpart.

The last *Geisler* factor requires an examination of the relevant economic and sociological factors as well as public policy. *State* v. *Geisler*, supra, 222 Conn. 685; see *State* v. *Stenner*, supra, 281 Conn. 762 (sixth *Geisler* factor focuses on public policy considerations). The defendant, well supported by the amici curiae, contends that electronic recording of interrogations, by creating an accurate and neutral record of what occurred in the interrogation room, would have benefits across the criminal justice system, including protecting defendants from the admission of involuntary confessions and conserving judicial resources by reducing the need

---

[11] The rule established by the New Jersey Supreme Court also provides that the trial court should consider the unexcused failure to record a custodial interrogation when determining whether the state may introduce testimony describing the interrogation. N.J. Court Rules 3:17 (d). Additionally, the court is required to give the jury a cautionary instruction in such cases; N.J. Court Rules 3:17; and a report issued by the New Jersey Supreme Court Special Committee on Recordation of Custodial Interrogations in 2005 recommended an instruction that the jury has "not been provided with a complete picture of all of the facts surrounding the defendant's alleged statement and the precise details of that statement."

Similarly, the Supreme Judicial Court of Massachusetts, after declining to make the electronic recording of the defendant's interrogation a prerequisite to the admissibility of his statement, concluded that defendants are entitled to a cautionary instruction regarding the use of an interrogation when the interrogation was not reliably preserved by a complete electronic recording. *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447–49, 813 N.E.2d 516 (2004).

for hearings on motions to suppress. The state argues that whether to mandate electronic recording of interrogations is a public policy matter, consideration of which is better suited to the legislature. Although, as we have already discussed, a majority of state courts have declined to impose a mandatory recording requirement, many of them, including this court; *State* v. *James*, supra, 237 Conn. 432, 434; have noted the benefits of electronically recording interrogations and *Miranda* advisements. See, e.g., *State* v. *Jones*, 203 Ariz. 1, 7, 49 P.3d 273 (2002) (videotaping entire interrogation process, including advice of rights, waiver of rights, questioning and confessions, is better practice than partial recording); *Stoker* v. *State*, 692 N.E.2d 1386, 1390 (Ind. App. 1998) (strongly recommending policy of recording custodial interrogations); *State* v. *Kilmer*, 190 W. Va. 617, 629, 439 S.E.2d 881 (1993) (law enforcement officers would be wise to implement recording policy because it would be beneficial to law enforcement as well as to suspect and court when determining admissibility of confession).

First, and perhaps foremost in the minds of the defendant and amici curiae, recorded interrogations would protect the rights of the accused by creating an objective, reviewable record of the interrogation. Commentators argue that an electronic recording is a court's "best tool" in its voluntariness determination; D. Donovan & J. Rhodes, "Comes a Time: The Case for Recording Interrogations," 61 Mont. L. Rev. 223, 227 (2000); because "recordings are the only way in which the actual words, actions, tones and other details of interviews may be preserved." T. Sullivan, "Recording Federal Custodial Interviews," 45 Am. Crim. L. Rev. 1297, 1306 (2008). Proponents of mandatory electronic recording argue that, particularly in light of the fact that the memory of each witness fades with time, a recording would provide judges and juries with a more

accurate picture of what was said because words convey different meanings depending on the tone or nuance of the speaker. W. Westling, "Something is Rotten in the Interrogation Room: Let's Try Video Oversight," 34 J. Marshall L. Rev. 537, 550 (2000–2001). Advocates of a recording requirement also maintain that a recording would protect defendants from the admission of involuntary or invalid confessions by eliminating the "swearing contests between the police and the defendant regarding what was said." R. Iraola, "The Electronic Recording of Criminal Interrogations," 40 U. Rich. L. Rev. 463, 477 (2006).[12]

Proponents also argue that a recording would benefit police and prosecutors in cases where the defendant made a valid confession or inculpatory statements. As the Supreme Court of New Hampshire observed, "[l]istening to a defendant be inculpated by his or her own voice has a persuasive power unrivaled by contradictory testimonial evidence." *State* v. *Barnett*, 147 N.H. 334, 337, 789 A.2d 629 (2001); see T. Sullivan, "The Time Has Come for Law Enforcement Recordings of Custodial Interviews, Start to Finish," 37 Golden Gate U. L. Rev. 175, 179 (2006) (prosecutors have reported that "proof of confessions or admissions, or evasions and signs of guilty conscience, is immeasurably stronger when established by electronic recordings, rather than by police testimony based on notes, typewritten reports, and testimonial descriptions," increasing both guilty pleas and prosecutor's bargaining power with respect to sentencing).

Additionally, advocates of a recording requirement maintain that electronic recordings would protect police officers from false allegations of misconduct or

---

[12] At least one commentator has argued, however, that a fact finder can no better " 'see' " coercion in a filmed confession than when that confession is described by testimony. J. Silbey, "Videotaped Confessions and the Genre of Documentary," 16 Fordham Intell. Prop. Media & Ent. L.J. 789, 802 (2006).

constitutional violations. The Supreme Court of Alaska observed that "[a] recording, in many cases, will aid law enforcement efforts, by confirming the content and the voluntariness of a confession, when a defendant changes his testimony or claims falsely that his constitutional rights were violated." *Stephan* v. *State*, supra, 711 P.2d 1161; see *In re Jerrell C.J.*, supra, 283 Wis. 2d 170 (recording will protect individual interest of police officers wrongfully accused of improper tactics because suspects will be unable to contradict objective record of interrogation); T. Sullivan, supra, 45 Am. Crim. L. Rev. 1308 ("[r]ecordings eliminate the risk that courts will exclude suspects' statements from evidence because of contradictory and confusing testimony as to what occurred behind closed doors"). Moreover, commentators observe that recording interrogations would protect police and taxpayers from the costly civil rights claims that stem from false allegations of misconduct. T. Sullivan, supra, 45 Am. Crim. L. Rev. 1310.

Commentators also argue that recording interrogations would benefit police by allowing them to focus on the suspect during the interview rather than take notes and because such a practice would provide a record for officers to refer to during an ongoing investigation. See L. Lewis, "Rethinking *Miranda*: Truth, Lies, and Videotape," 43 Gonz. L. Rev. 199, 222 (2007–2008). Advocates of recording requirements note that videotaped recordings of interrogations would provide an opportunity for supervisors to evaluate officers and to discipline officers when necessary, and could serve as examples in officer training. M. Thurlow, "Lights, Camera, Action: Video Cameras as Tools of Justice," 23 J. Marshall J. Computer & Info. L. 771, 811 (2005). Recordings could also help law enforcement officers identify and eliminate interrogation methods that are more likely to lead to false confessions. W. White, "False

Confessions and the Constitution: Safeguards Against Untrustworthy Confessions," 32 Harv. C.R.-C.L. L. Rev. 105, 154–55 (1997); see also G. Johnson, "False Confessions and Fundamental Fairness: The Need for Electronic Recording of Custodial Interrogations," 6 B.U. Pub. Int. L.J. 719, 751 (1997) ("without electronic recording [of interrogations] . . . wrongful convictions based on false confessions will needlessly continue").

Significantly, courts have identified the additional benefit that recording interrogations would conserve judicial resources by assisting in the timely resolution of motions to suppress. More specifically, a recording requirement would reduce the number of pretrial suppression motions based on claims that the *Miranda* waiver or confession was involuntary. See *Commonwealth* v. *Diaz*, 422 Mass. 269, 272, 661 N.E.2d 1326 (1996) (recording would eliminate certain challenges to admissibility and aid in resolution of those challenges). "[C]ourts spend an inordinate amount of time and resources wrestling with such slippery matters." *In re Jerrell C.J.*, supra, 283 Wis. 2d 170; see also *State* v. *Godsey*, supra, 60 S.W.3d 772 ("[t]here can be little doubt that electronically recording custodial interrogations would reduce the amount of time spent in court resolving disputes over what occurred during the interrogation"). Supporters claim that electronic recordings would also be a significant aid to appellate courts dealing with the same nuanced and fact specific issues. See L. Lewis, supra, 43 Gonz. L. Rev. 221 (arguing that increased accuracy at trial level will lessen workload of appellate courts).

There are, however, drawbacks to a recording requirement. The financial cost of purchasing, installing and maintaining electronic equipment, as well as training officers on the proper use of the equipment, would be a significant expenditure. "Police departments,

already short on funding, are unlikely to be receptive to further financial outlays for video-recording equipment." E. Sackman, "False Confessions: Rethinking a Contemporary Problem," 16 Kan. J. L. & Pub. Policy 208, 229 (2006–2007). Even proponents of a recording requirement concede that these costs "can be prohibitive." M. Thurlow, supra, 23 J. Marshall J. Computer & Info. L. 797. Additionally, "[r]equiring the police to record all confessions and interrogations in places of detention might severely inhibit the police in pursuing, by constitutionally valid methods, confession evidence. Moreover, a criminal suspect's knowledge that an interview with the police will be recorded might limit his or her willingness to speak with the police. We have noted that it is a common experience of life that in many circumstances persons are willing to convey information orally but are reluctant to put the same thing in writing. *State* v. *Frazier*, [185 Conn. 211, 225, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982)]; see also *United States* v. *Cooper*, 499 F.2d 1060, 1062 (D.C. Cir. 1974) (same). Similarly, a criminal defendant may be more forthcoming when speaking to the police without the presence of a tape recorder or video camera." (Internal quotation marks omitted.) *State* v. *James*, supra, 237 Conn. 433–34; see also T. Sullivan, supra, 45 Am. Crim. L. Rev. 1321 (federal bureau of investigation has expressed concern that recording interrogations would hinder rapport-building).

We reaffirm our statement in *James* that "the recording of confessions and interrogations generally might be a desirable investigative practice, which is to be encouraged"; *State* v. *James*, supra, 237 Conn. 434; particularly in light of the fact that, by creating an objective, complete reviewable record of the interrogation and *Miranda* warnings, an electronic recording could aid courts in evaluating the reliability and trustworthi-

ness of confessions.[13] Id., 432. In this way, an electronic recording would help to increase both the accuracy and the efficiency of judicial proceedings and, therefore, we would welcome such a resource. In addition to weighing and balancing the benefits and drawbacks of an electronic recording requirement, however, creating a recording mandate requires establishing the parameters of such a rule.[14] For example, the rule could apply only

[13] The concurrence makes an impassioned plea for the point that no one in the majority disagrees with, namely, that the recording of confessions is desirable as an aid in evaluating the reliability and trustworthiness of confessions to increase the accuracy and efficiency of judicial proceedings, which we would welcome. *State* v. *James*, supra, 237 Conn. 434. The concurrence supports its argument, in part, with material not in the record, much of which would be inadmissible hearsay, from the Internet and other sources such as the Chicago Tribune, MSN.com and AOL.com. The disagreement then is whether this court should mandate recording and under what terms and conditions. For the reasons set forth fully in this opinion, we believe that this is not an appropriate use of our supervisory powers at this time and a potential usurpation of a legislative initiative presently under way. See Public Acts 2008, No. 08-143, § 2 (a) (2) (P.A. 08-143) (pilot program to record interrogations). In February, 2009, the Advisory Commission on Wrongful Convictions filed a report, pursuant to P.A. 08-143, with the General Assembly regarding the pilot program to electronically record interrogations. See State of Connecticut Advisory Commission on Wrongful Convictions, Report of the Advisory Commission on Wrongful Convictions (February, 2009), available at http://www.jud.ct.gov/Committees/wrongfulconviction/WrongfulConvictionComm_Report.pdf (last visited September 29, 2010). The General Assembly has not yet acted on the report.

[14] The discussion of the Supreme Judicial Court of Massachusetts concerning the complexity of deciding the parameters of a recording requirement illustrates the point: "Although appealing in its superficial simplicity (and unquestionably an effective method of convincing law enforcement officials to adopt recording as a standard practice), we still decline to impose such a rule. Among other problems, adoption of a rule excluding evidence of unrecorded interrogations necessitates precise identification of what interrogations will be subject to that rule—does it cover only custodial interrogations, or should it also cover any noncustodial interrogation conducted in particular locations (e.g., at police stations)? If the requirement were to be premised on the custodial (as opposed to noncustodial) nature of the interrogation, what do we do with interrogations that start out as noncustodial but arguably become custodial at some later (and often disputed) point during questioning? A rule of exclusion would also have to allow for justifiable failures to record—e.g., equipment malfunction, or the suspect's refusal to allow recording (or insistence that the tape recorder be turned off at a particular point during the interrogation). . . . With regard to a suspect

when police officers are interrogating suspects within Connecticut or only when police officers are interviewing juveniles. Additionally, there is a question as to whether the rule should apply to interrogations of individuals suspected of all crimes, including misdemeanors such as shoplifting, or only certain serious offenses such as homicides and sexual assaults. Establishing a recording mandate would also require determining whether voluntary statements and noncustodial interrogations would be included under such a regime. Moreover, there is the issue of what portion of the interrogation must be recorded. This could include the entire interaction between the suspect and the police, the giving and waiver of *Miranda* rights or everything after the suspect has been given his or her *Miranda* rights. There is also the significant issue of establishing the consequences for failure to record an interrogation, namely, whether the defendant's statements must be suppressed or whether the state may introduce the statements after establishing that the statements were given voluntarily by a preponderance of the evidence. The recording requirements imposed by a number of state legislatures illustrate both the complexity of this issue, as well as the panoply of options in imposing such a rule. See, e.g., D.C. Code Ann. § 5-116.01 (LexisNexis 2009) (police shall record custodial interrogation beginning with first contact between police and suspect once suspect has been

---

who is willing to speak to the interrogator but initially unwilling to be recorded, would we need to impose some requirement that the interrogator make a good faith effort to convince the suspect to agree to recording, lest that ostensible 'justification' for not recording too easily become the exception that swallows the rule? Notwithstanding predominantly positive experiences in those jurisdictions that have imposed recording requirements as a prerequisite to admissibility, we are hesitant to formulate a rigid rule of exclusion, and all its corollary exceptions and modifications (each of which would potentially spark new disputes in motions to suppress)." (Citation omitted.) *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 445, 813 N.E.2d 516 (2004).

placed in interrogation room and shall include warnings of constitutional rights and response of suspect to such warnings); D.C. Code Ann. § 5-116.03 (LexisNexis 2009) (unrecorded statement of defendant is subject to rebuttable presumption that statement was involuntary, which may be overcome by clear and convincing evidence that statement was voluntarily given); 725 Ill. Comp. Stat. Ann. § 5/103-2.1 (f) (West 2006) (oral or written statement by defendant made as result of custodial interrogation presumed inadmissible if interrogation is not electronically recorded, which may be overcome by preponderance of evidence that statement was voluntary and is reliable based on totality of circumstances); Me. Rev. Stat. Ann. tit. 25, § 2803-B (1) (K) (2007), as amended by 2009 Me. Laws 336, § 18 (law enforcement must adopt written policies for digital, electronic, audio, video or other recording of law enforcement interviews of suspects in serious crimes and preservation of investigative notes and records in such cases); M.D. Code Ann., Crim. Proc. § 2-402 (1) (LexisNexis 2008) (law enforcement unit that regularly uses one or more interrogation rooms capable of audiovisual recording of custodial interrogations "shall make reasonable efforts to create an audiovisual recording of a custodial interrogation" of suspect in cases involving murder, rape, sexual assault in first degree or sexual assault in second degree); N.M. Stat. Ann. § 29-1-16 (Cum. Sup. 2008) (custodial interrogation and advisement of constitutional rights must be recorded in entirety when individual is suspected of committing felony offense, unless interrogation takes place outside of state or within correctional facility); N.C. Gen. Stat. § 15A-211 (d) through (f) (2009) (law enforcement officer conducting custodial interrogation in homicide investigation must make electronic recording of interrogation in entirety and failure to comply with requirement shall be considered by court in adjudicating

motions to suppress); Tex. Code Crim. Proc. Ann. art. 38.22 (3) (a) (1) and (2) (Vernon 2005) (statement made during custodial interrogation inadmissible unless statement, advisement of rights and waiver of rights are electronically recorded); Wis. Stat. § 968.073 (2) (2007) (policy of state is to make electronic recording of custodial interrogations of persons suspected of committing felony); Wis. Stat. § 972.115 (2) (a) (2007) (in absence of exception to recording requirement, defendant is entitled, subject to enumerated exceptions, to jury instruction that it is state policy to record custodial interviews and that jury may consider lack of recording when evaluating testimony regarding interrogation).

Similarly, the lack of uniformity among the rules created by high courts of other states, either by way of constitutional interpretation or pursuant to their supervisory power, illustrates the variety of ways in which such a policy may be implemented. See, e.g., *Stephan* v. *State*, supra, 711 P.2d 1162 (due process clause of state constitution requires that entire custodial interrogation, including advisement of *Miranda* rights, be recorded); *State* v. *Barnett*, supra, 147 N.H. 337–38 (establishing pursuant to supervisory authority that electronic recordings of custodial interrogations are only admissible when defendant's statement has been recorded in its entirety); *State* v. *Cook*, supra, 179 N.J. 562 (establishing committee to study electronic recording of custodial interrogations); *In re Jerrell C.J.*, supra, 283 Wis. 2d 172 (establishing recording requirement for custodial interrogations pursuant to supervisory authority).[15]

---

[15] The Supreme Court of New Hampshire, in contrast, responded to the defendant's claim that interrogations must be electronically recorded by using its supervisory authority to impose a rule that tape-recorded interrogations are admissible only when the defendant's statement is recorded in its entirety "[t]o avoid the inequity inherent in admitting into evidence the selective recording of a post-*Miranda* interrogation . . . ." *State* v. *Barnett*, supra, 147 N.H. 337.

Determining the parameters of such a rule requires weighing competing public policies and evaluating a wide variety of possible rules. *Clark* v. *State*, supra, 374 Ark. 304 (it would be "difficult task [to draft] a rule that would clearly delineate the parameters of a recording requirement"). In our view, such determinations are often made by a legislative body because it is in a better position to evaluate the competing policy interests at play in developing a recording requirement in that it can invite comment from law enforcement agencies, prosecutors and defense attorneys regarding the relevant policy considerations and the practical challenges of implementing a recording mandate. See *Turner Broadcasting System, Inc.* v. *Federal Communications Commission*, 512 U.S. 622, 665–66, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994) ("[a]s an institution . . . Congress is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon an issue as complex and dynamic as that presented here" [internal quotation marks omitted]); *Patsy* v. *Board of Regents*, 457 U.S. 496, 513, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982) ("[T]he relevant policy considerations do not invariably point in one direction, and there is vehement disagreement over the validity of the assumptions underlying many of them. The very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable."); *United States* v. *Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977) (need for recording requirement and particular form of rule "are appropriate matters for consideration by Congress, not for a court exercising an appellate function"). Our view that the legislature is better suited to create a recording requirement is informed by the experience of other states, namely, the varying contours of the mandates imposed by other legislatures and

courts.[16] Notably, the New Jersey Supreme Court first established a committee "to study and make recommendations on the use of electronic [recording] of custodial interrogations." *State* v. *Cook*, supra, 179 N.J. 562. The court refrained from establishing a recording requirement until it was presented with the committee's recommendations and, as a result of those recommendations, imposed a rule requiring electronic recording of interrogations in investigations of homicides and other serious felonies only. See N.J. Court Rules 3:17. Stated another way, although it is our province to rule on state constitutional matters, this particular question involves factual issues, the gathering and evaluation of which is, in this case, the proper function of the legislature. See also *Craig* v. *Driscoll*, 262 Conn. 312, 352–53, 813 A.2d 1003 (2003) (*Sullivan, C. J.*, dissenting) ("the legislature . . . can invite public participation in the analysis of all relevant policy considerations"). Thus, although a recording requirement may be desirable and aid in the fair resolution of criminal matters, "[i]t is emphatically the province and duty of [this court] to say what the law is." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803); see also *Symsbury Case*, 1 Kirby (Conn.) 444, 447 (1785) (declaring legislative enactment void). We cannot construe article first, §§ 8 and 9, of our state constitution to impose such a requirement. We emphasize that, consistent with our view that a recording mandate could yield important benefits and that the legislature is better equipped to define that mandate, the legislature has ordered an evaluation of the pilot program to electronically record interrogations. See Public Acts 2008, No. 08-143, § 2 (a) (2) (P.A. 08-143).

---

[16] As we have discussed previously, the requirement might be imposed only with respect to defendants charged with particular classifications of crimes, such as felonies. In the alternative, such a rule could apply in all circumstances.

The defendant also argues, in the alternative, that we should adopt a recording requirement pursuant to our inherent supervisory powers. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process." (Citations omitted; internal quotation marks omitted.) *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836 (2002). The exercise of our supervisory powers is "an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 215, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 12 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). In exercising our supervisory powers, we must be mindful of the practical considerations set forth previously in this opinion. Moreover, the defendant's claim implicates the scope of our supervisory authority because we normally exercise this power with regard to the conduct of judicial actors. See *State* v. *James*, supra, 237 Conn. 434 n.36. Although imposing a recording requirement would directly affect the admissibility of evidence, which is surely within the authority of this court, it would also directly affect all law enforcement agencies. See *State* v. *Valedon*, supra, 386. Even assuming that the imposition of such a rule falls within the ambit of our supervisory powers, we decline to establish a recording requirement. "Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance where

these traditional protections are inadequate to ensure the fair and just administration of the courts." (Internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 315, 972 A.2d 691 (2009). Given the procedures already in place to prevent the admission into evidence of involuntary or untrustworthy confessions, namely, the voluntariness determination that must be made by the trial court, we are not convinced that the failure of police to record interrogations is a threat to "the integrity of a particular trial . . . [or] the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Marquez*, 291 Conn. 122, 166, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

In sum, we acknowledge, as does the state, that a requirement that the police record all interrogations *could* benefit the criminal justice system.[17] Although we do have supervisory authority over the administration of justice, such power is to be used as an extraordinary remedy only. Because we believe that the legislature is better suited to gather and assess the facts necessary to establishing a recording requirement, we defer to this branch. Indeed, the legislature has acted on its role with regard to this very issue and, in the absence of a determination that such a rule is constitutionally mandated, we decline to exercise any authority we might have in this regard. See P.A. 08-143, § 2 (a) (2).

Therefore, we reject the defendant's claim.

## II

The defendant also claims that the trial court improperly allowed the state to elicit testimony from a detec-

---

[17] Such a rule could also, as we have discussed, have negative repercussions for the administration of justice. In this regard, we emphasize the important difference between a *constitutionally* mandated rule that *all* interrogations must be recorded, and a policy, adopted by the police departments of this state, that recordings must be made whenever feasible and whenever such recording would not inhibit law enforcement agents from obtaining a confession by other constitutionally permissible means.

tive that described the defendant's assertion of his right to remain silent in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The defendant argues that this violation of his constitutional right to remain silent requires reversal of his conviction and a new trial. In support of his claim, the defendant points to six instances in which the state allegedly violated his right to remain silent; namely, three references to his refusal to sign the *Miranda* rights card, as well as references to his refusal to give a written statement, his refusal to answer questions and arrogant demeanor, and his statement that he is not a snitch. The state contends that the detective's reference to the defendant's refusal to sign the *Miranda* rights card or to provide a written statement is a constitutionally permissible description of the investigative efforts by the police. The state also argues that testimony regarding the defendant's statement that he is not a snitch is not a *Doyle* violation because the defendant had waived his right to remain silent. The state further argues that the detective's testimony that the defendant was arrogant during the interrogation is a permissible description of the defendant's physical demeanor rather than a reference to the defendant's post-*Miranda* silence. Finally, the state argues that even if the testimony included impermissible comments regarding the defendant's post-*Miranda* silence, the error was harmless beyond a reasonable doubt. We agree with the state.

The record reveals the following additional facts. At trial, Detective Anthony Buglione of the Connecticut state police testified that he and Detective Robert Johnson, also a member of the Connecticut state police, interviewed the defendant on June 18, 2003. Buglione testified that the interview took place at a jail in Atlanta, Georgia, where the defendant was being held. Buglione explained that he had read the defendant his *Miranda* rights from a blue card, that both he and Johnson had

initialed, dated and signed the blue card, but the defendant had refused to sign the blue card. After further questioning regarding the initials on the blue card, the prosecutor asked Buglione if, after reading the defendant his *Miranda* rights, he had asked the defendant any questions about those rights. Buglione testified that he had asked the defendant if he would sign the blue card, which the defendant had refused to do, and if he understood the rights, which the defendant had answered by nodding.

Buglione further testified that when he asked the defendant if he wanted to speak with the detectives, the defendant stated that he did not know anything about a murder in Connecticut and was not in the state on May 9, 2002, a date that the detectives had not yet mentioned. Buglione testified that the defendant had proceeded to ask and answer questions regarding the murder investigation. According to Buglione, after the defendant stated that if anybody saw him at the crime scene or killing anyone, they would be lying, the interviewed ended. Buglione testified that he had asked the defendant if he would provide a written statement, which the defendant declined to do.

The prosecutor then asked Buglione if the defendant had asked the detectives about the status of the investigation. Buglione testified that the defendant had asked whether Bunch had been arrested, that he then told the defendant that Bunch was only a suspect at that time, and asked the defendant if he had any information about Bunch. Buglione explained that the defendant had stated that "he wasn't a snitch . . . [and] wouldn't say anything else."

The prosecutor asked Buglione to characterize the defendant's demeanor as well as his own demeanor and that of Johnson during the interview. Buglione testified that the defendant was "arrogant" and that he and John-

son were "very calm." The prosecutor continued to ask Buglione about the blue card. Buglione explained that he had used the blue card instead of the standard form because he and Johnson had forgotten the standard form. The prosecutor then established that the standard form had a place for suspects to initial that they had received their rights and again asked the detective if he had asked the defendant to sign the blue card. Buglione responded that the defendant had declined to sign the blue card.

Because the defendant's claim is unpreserved, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[18] The first two prongs of the *Golding* analysis are easily satisfied in this case because the record is adequate for our review and the defendant's claim that the state violated his right to remain silent is of constitutional magnitude. See, e.g., *State* v. *Alston*, 272 Conn. 432, 439–40, 862 A.2d 817 (2005). We turn to the third and forth prongs.

"In *Doyle* [v. *Ohio*, supra, 426 U.S. 610] . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that

---

[18] Pursuant to *State* v. *Golding*, *supra*, 213 Conn. 239–40, a defendant can prevail on an unpreserved claim of constitutional error only if each of four conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt."

silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. . . . The court . . . reaffirmed *Doyle*'s reasoning in *Wainwright* v. *Greenfield*, 474 U.S. 284, 290, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), in which it held that the defendant's silence following his arrest and receipt of *Miranda* warnings could not be used at trial to rebut his defense of insanity. The court reasoned: The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." (Internal quotation marks omitted.) *State* v. *Cabral*, 275 Conn. 514, 523–24, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005).

This court has recognized that it is also fundamentally unfair and a deprivation of due process for the state to use evidence of the defendant's post-*Miranda* silence as affirmative proof of guilt; *State* v. *Kirby*, 280 Conn. 361, 400, 908 A.2d 506 (2006); and has noted that post-*Miranda* silence under *Doyle* "does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted. *Wainwright* v. *Greenfield*, supra, 474 U.S. 295 n.13." (Internal quotation marks omitted.) *State* v. *Cabral*, supra, 275 Conn. 524.

This court has also recognized that "[r]eferences to one's invocation of the right to remain silent [are] not always constitutionally impermissible . . . [and are] allowed . . . in certain limited and exceptional circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Alston*, supra, 272 Conn. 441. Specifically, the state is permitted "some leeway in

adducing evidence of the defendant's assertion of that right for purposes of demonstrating the investigative effort made by the police and the sequence of events as they unfolded . . . as long as the evidence is not offered to impeach the testimony of the defendant in any way." (Citation omitted; internal quotation marks omitted.) *State* v. *Cabral*, supra, 275 Conn. 525.

The defendant claims that Buglione's testimony regarding his refusal to sign the blue card constituted an impermissible reference to his assertion of his right to remain silent. Specifically, the defendant relies on the decisions of this court in which we have concluded that the invocation of the right to remain silent includes conduct that conveys silence. See, e.g., *State* v. *Jones*, 215 Conn. 173, 183–84, 575 A.2d 216 (1990) (defendant invoked right to remain silent when, after receiving *Miranda* rights, he refused to sign previously transcribed statement). In the present case, however, the defendant's refusal to sign the blue card was not an invocation of his right to remain silent. Significantly, the defendant refused to sign the card, but then began speaking with the detectives. As a result, "[t]he *Doyle* decision . . . is not applicable to [these] facts . . . . The crucial distinction is that, here, the defendant did not remain silent after he was . . . advised of his rights. After being given *Miranda* warnings, the defendant clearly chose to [forgo] his right to remain silent." *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985); see also *State* v. *Kirby*, supra, 280 Conn. 401 (testimony that defendant stated that he did not want to deal with filling out paperwork and that he " 'knew what he had done was wrong' " did not constitute *Doyle* violation because defendant did not invoke right to remain silent); *State* v. *Joly*, 219 Conn. 234, 257, 593 A.2d 96 (1991) ("[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. . . . Rather than relying on the implicit

assurance that silence would carry no penalty . . . the defendant failed to heed the warning that anything said can and will be used against [him] in court." [Citations omitted; internal quotation marks omitted.]).

We similarly may resolve the defendant's claim that Buglione's testimony that, when asked about Bunch, the defendant had stated that he was not a "snitch" and "wouldn't say anything else" was an impermissible reference to the defendant's post-*Miranda* silence. Specifically, the defendant argues that these statements were part of his assertion of his right to remain silent by ending the interrogation. The record, however, is unclear as to when during the interview the defendant made these statements. The testimony about which the defendant complains was elicited as follows:

"[The Prosecutor]: And did [the defendant] say anything else about the case?

"[Buglione]: At that particular point, we really didn't talk about it anymore. I asked him if he'd want to provide a written statement. He said no, he wouldn't provide anything in writing.

"[The Prosecutor]: How long did that conversation last?

"[Buglione]: Ten minutes.

"[The Prosecutor]: Did he ask you about the status of your investigation?

"[Buglione]: He asked us if [Bunch] was also getting arrested. We told him no, he was the only suspect in the matter at this time.

"[The Prosecutor]: And was there a further discussion about [Bunch]?

"[Buglione]: We asked him if he had information about [Bunch], if he played a part in this crime. [The

defendant] said he wasn't a snitch, he wouldn't say anything else."

"By speaking, the defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain selectively silent." (Internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 767, 931 A.2d 198 (2007), quoting *State* v. *Talton*, supra, 197 Conn. 295. Because we do not know when, during the course of the interview, the defendant made these statements, we cannot treat them as an assertion of his right to remain silent in view of the fact that he initially waived his *Miranda* rights by speaking with the detectives. See *State* v. *Lytell*, 206 Conn. 657, 662–63, 539 A.2d 133 (1988) (no *Doyle* violation when detective testified regarding defendant's refusal to provide names of alibi witnesses because refusal occurred after defendant had waived *Miranda* rights and spoken to police, but prior to defendant's termination of interrogation). Moreover, because the defendant may not remain " 'selectively silent' "; *State* v. *Bell*, supra, 767; testimony describing his refusal to discuss Bunch did not violate his constitutional rights.

The defendant further argues that the state violated *Doyle* when Buglione testified that the defendant had declined to give a written statement and thereafter ended the interview. We disagree. In *State* v. *Kirby*, supra, 280 Conn. 397, a police officer testified that after the defendant had made a statement, the officer again explained the *Miranda* rights form to him. In response, the defendant "just bowed his head and closed his

eyes," after which the officers stopped questioning him. Id. We concluded that this testimony did not constitute a *Doyle* violation, reasoning that "to the extent that any silence by the defendant after he made [the] statement [to police] was implicated," that implication was permissible "evidence of the defendant's assertion of [the right to remain silent] for the purposes of demonstrating the investigative effort made by the police and the sequence of events as they unfolded . . . ." (Internal quotation marks omitted.) Id., 401. Similarly, in the present case, Buglione's testimony was a permissible description of the end of the interview and was not an unconstitutional use of the defendant's post-*Miranda* silence.[19] Compare *State* v. *Alston*, supra, 272 Conn. 441–42 (testimony that defendant terminated interview

---

[19] The defendant relies on *State* v. *Jones*, supra, 215 Conn. 183, in which the state elicited testimony that on the day of the defendant's arrest, he gave a statement to a police officer claiming that he did not attack the victim. The statement was transcribed and presented to the defendant the next day. Id. The officer read the defendant his rights, and the defendant signed an acknowledgment of those rights, but he refused to sign the transcribed statement. Id. In addition to this testimony, the prosecutor referred to the defendant's refusal to sign the statement twice in his closing argument in order to impeach the defendant and attack his credibility. Id. We concluded that the testimony regarding the defendant's refusal to sign the statement was elicited in violation of *Doyle* because when, after receiving his *Miranda* rights, the defendant "chose not to sign his statement . . . [h]e . . . clearly manifested his exercise of his right to remain silent." Id., 184. In contrast, the defendant in the present case waived his right to remain silent by speaking with the detectives and, thereafter, refused to sign a written statement, invoked his *Miranda* rights and ended the interview. The testimony regarding the defendant's refusal to sign the statement was elicited to explain the course of events and investigative efforts of the police. The prosecutor referred to the blue card generally in his closing argument and subsequently suggested that the defendant had been untruthful when speaking with the police, but did not specifically comment on the defendant's refusal to sign a written statement. In contrast, the impermissible testimony in *Jones* was not elicited to explain the course of events following the defendant's admissible statements. Id., 183. Moreover, the testimony was not an isolated reference to the defendant's post-*Miranda* silence, rather it was used during the closing argument to suggest that the defendant was not credible. Id., 183–84. It is therefore inapposite to the present case.

after police confronted him with evidence conflicting with alibi permissible description of sequence of events) and *State* v. *Cabral*, supra, 275 Conn. 525–26 (testimony that defendant, after initially speaking with police, refused to put statement into writing, invoked right to remain silent and requested attorney did not violate *Doyle* because it was elicited to explain course of events and to place defendant's statement in context), with *State* v. *Morrill*, 197 Conn. 507, 529–31, 538, 498 A.2d 76 (1985) (testimony that defendant did not respond and bowed his head when asked twice if he had killed victim, and that when asked third time, gave sarcastic response and reiterated that he would not give police information unless deal could be made with prosecutor was *Doyle* violation).

Finally, the defendant argues that the state improperly elicited testimony that the defendant's demeanor during the interview was arrogant because this description was an impermissible use of the defendant's invocation of his right to remain silent. The defendant relies on our conclusions in *State* v. *Montgomery*, 254 Conn. 694, 759 A.2d 995 (2000), and *State* v. *Plourde*, 208 Conn. 455, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989), that the state had violated *Doyle* by introducing testimony describing a defendant's nonverbal actions and demeanor. Those cases, however, are distinguishable from the matter before us.

In *Montgomery*, the state introduced testimony that the police officer's interview of the defendant ended when tears welled up in the defendant's eyes and he signaled for a nurse to terminate the interview. *State* v. *Montgomery*, supra, 254 Conn. 712. Similarly, in *Plourde*, a detective testified that he ceased interrogation when the defendant became visibly shaken and stated that he wanted to call his attorney. *State* v. *Plourde*, supra, 208 Conn. 464–65. In both of these cases,

the testimony described the defendant's nonverbal actions and demeanor when he terminated the interview, thereby invoking his right to remain silent. In the present case, Buglione testified, in response to the prosecutor's question regarding the defendant's demeanor *throughout the interview*, that the defendant had seemed arrogant. This characterization was not a description of the manner in which the defendant nonverbally ended the interview or evidenced his intent to invoke his right to remain silent. Therefore, unlike the impermissible testimony in *Montgomery* and *Plourde*, Buglione's description of the defendant's demeanor did not violate *Doyle*.

The judgment is affirmed.

In this opinion ROGERS, C. J., and ZARELLA and GRUENDEL, Js., concurred.

PALMER, J., concurring. I disagree with the majority's refusal to exercise this court's inherent supervisory authority over the administration of justice[1] to establish a rule that, whenever reasonably feasible, police station

---

[1] "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . [T]he integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Connor*, 292 Conn. 483, 518–19 n.23, 973 A.2d 627 (2009). Thus, "[s]upervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Ouellette*, 271 Conn. 740, 762 n.28, 859 A.2d 907 (2004).

interrogations of suspects shall be recorded electronically.[2] The reasons favoring such a recording requirement are truly compelling,[3] whereas the arguments against it are wholly unpersuasive. Indeed, each and every substantive argument that the state and the majority raise against a recording requirement has been discredited by the experience of those police departments, in this state and across the country, that record interrogations as a matter of policy.[4] Contrary to the majority's assertion that a rule requiring the recording of interrogations "could . . . have negative repercussions for the administration of justice"; footnote 17 of the majority opinion; there is no question that such a rule would promote the fair and impartial administration of justice in this state. Simply put, in this day and age, there is no legitimate justification to refuse to adopt the require-

---

[2] The statement that the defendant, Julian J. Lockhart, gave to the police in the present case occurred at a police station following the defendant's arrest, and the defendant claims only that custodial interrogations conducted at a police station must be recorded. I see no reason, however, why such a rule should not be extended to include all interrogations of suspects that the police conduct at a police station or some other similar location. In addition, when I refer to electronic recordings, I am referring to recordings that contain both audio and video components.

[3] As I explain more fully hereinafter, "there can be little doubt that recording confessions would dramatically reduce, if not eliminate, any possible likelihood of an erroneous conviction predicated on an involuntary [or false] confession. Indeed, videotaping confessions would greatly aid both the trial court and the jury in evaluating the voluntariness and, ultimately, the reliability of those confessions.

"Moreover . . . it is apparent that the risk of a false confession is appreciably greater in cases of juveniles and persons with mental disabilities. Because children and mentally disabled persons are especially vulnerable to police overreaching—and because it appears that they also are more likely than others to confess falsely even in the absence of improper government coercion—videotaping confessions by such persons would serve an especially salutary purpose." *State* v. *Lawrence*, 282 Conn. 141, 185, 920 A.2d 236 (2007) (*Palmer, J.*, concurring).

[4] In this state, the police record interrogations only when they choose to do so in the exercise of their discretion. Although some confessions are recorded, it appears that the vast majority are not.

ment under this court's supervisory powers.[5] Because, however, the failure of the police to record the interrogation of the defendant in the present case was harmless, I concur in the result that the majority reaches.[6]

I

The value in recording interrogations is so obvious as to require little discussion. When a confession[7] is memorialized in such a manner, the fact finder need not rely exclusively, or even primarily, on the recollections and testimony of those present at the interrogation in order to determine precisely what occurred when the confession allegedly was obtained. As the United States Supreme Court has observed, the interrogation of suspects by the police generally takes place in secret; the suspect is isolated, incommunicado, from everyone but his interrogators, a scenario that necessarily "results in a gap in our knowledge as to what in fact goes on in the interrogation rooms." *Miranda* v. *Arizona*, 384 U.S. 436, 448, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Courts and juries nevertheless are required to decide whether a confession represents the suspect's free and voluntary decision to acknowledge criminal wrongdoing, free from coercion by the police. Sometimes, however, the issue is not so much whether the confession was the product of police coercion but, rather, whether

[5] As the majority has explained, this court never has considered whether to adopt a recording requirement for police interrogations under our supervisory authority. Although the claim was raised by the defendant in *State* v. *James*, 237 Conn. 390, 678 A.2d 1338 (1996), we concluded that the claim had not been adequately briefed and, therefore, declined to address it. Id., 434–35 n.36.

[6] I agree with all aspects of the majority opinion other than the majority's treatment of the defendant's supervisory authority claim.

[7] I use the term "confession" for ease of reference only. Police interrogation of suspects sometimes results in a confession, sometimes in an incriminating statement short of a full confession, and sometimes in an exculpatory statement. For purposes of this opinion, the recording requirement applies to all such statements obtained from a suspect by the police at the police station.

the interrogation methods used by the police, which often include sophisticated psychological ploys and techniques, caused the suspect to admit to a crime that he did not commit. See, e.g., B. Garrett, "The Substance of False Confessions," 62 Stan. L. Rev. 1051, 1060 (2010) ("People have long falsely confessed not just in cases involving police torture or the 'third degree' but also in cases involving psychological techniques commonly used in modern police interrogations. Over the past two decades, scholars, social scientists, and writers have identified at least 250 cases in which they determined that people likely falsely confessed to crimes. New cases are regularly identified."). In all cases, a recording of the interrogation provides the fact finder with an objectively accurate picture of what transpired during the questioning, thereby greatly enhancing the fact finder's ability to evaluate the voluntariness and validity of the confession. For that reason alone, the value of recording interrogations is immeasurable.

In recent years, the critical importance of recording interrogations has become even clearer due to an increasing awareness of the phenomenon of false confessions. According to the Innocence Project, a national litigation and public policy organization affiliated with the Benjamin N. Cardozo School of Law of Yeshiva University, "[f]or many reasons—including mental health issues and aggressive law enforcement tactics—innocent people sometimes confess to crimes they did not commit." Innocence Project, "False Confessions and Mandatory Recording of Interrogations," available at http://www.innocenceproject.org/fix/False-Confessions.php (last visited September 27, 2010). "While it can be hard to understand why someone would falsely confess to a crime, psychological research has provided some answers—and DNA exonerations have proven that the problem is more widespread than many people think. In approximately 25 [percent] of the [cases

involving] wrongful convictions overturned [through the use of] DNA evidence, defendants made false confessions, admissions or statements to law enforcement officials."[8] Id.; see also id. (concluding that "[t]he electronic recording of interrogations, from the reading of *Miranda* rights onward, is the single best reform available to stem the tide of false confessions").

Although falsely confessing to a crime seems highly counterintuitive to most people, "[a] variety of factors can contribute to a false confession during a police interrogation." Innocence Project, "False Confessions," available at http://www.innocenceproject.org/understand/False-Confessions.php (last visited September 27, 2010). They include duress, coercion, intoxication, diminished capacity, mental impairment, ignorance of the law, fear of violence, the actual infliction of harm, the threat of a harsh sentence, and a misunderstanding of the situation. Id. "Confessions obtained from juveniles are often unreliable—children can be easy to manipulate and are not always fully aware of their situation. [Sometimes] [c]hildren and adults both are . . . convinced that that they can 'go home' as soon as they admit guilt." Id. "People with mental disabilities . . . often falsely [confess] because they are tempted to accommodate and agree with authority figures." Id. "Regardless of the age, capacity or state of the confes-

---

[8] I note that the majority takes me to task for relying on certain sources of information containing material that it characterizes as inadmissible hearsay. See footnote 13 of the majority opinion. This criticism is unfounded because this court routinely relies on such sources when the information is helpful to the court in ascertaining the content of law and policy. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 201–202, 957 A.2d 407 (2008); see also *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977) (legislative facts, that is, facts that "help determine the content of law and policy," can be "judicially noticed without affording the parties an opportunity to be heard"). Moreover, the majority does not point to any particular facts or information in this opinion with which it takes issue; indeed, the majority acknowledges that a recording requirement would be a "welcome" development. Footnote 13 of the majority opinion.

sor, what they often have in common is a decision—at some point during the interrogation process—that confessing will be more beneficial to them than continuing to maintain their innocence." Id. In one recent study involving forty proven cases of false confession, "innocent people not only falsely confessed, but they also offered surprisingly rich, detailed, and accurate information. . . . Often those details included reportedly 'inside information' that only the rapist or murderer could have known. We now know that each of these people was innocent and was not at the crime scene. Where did those details, recounted at length at trial and recorded in confession statements, come from? . . . In many cases . . . police likely disclosed those details during the interrogations by telling exonerees how the crime happened." B. Garrett, supra, 62 Stan. L. Rev. 1054.

"One of the most publicized examples of the system's failure to protect innocent confessors is the [New York City] Central Park jogger case. Five young men between the ages of fourteen and sixteen were convicted of the 1989 beating and rape that left the twenty-eight-year-old victim hospitalized for six weeks. Because the victim was incapable of identifying her attackers, the prosecution's case relied primarily on the youths' confessions . . . . [I]n January of 2002, Matias Reyes, while serving time for another 1989 rape and murder, confessed to the brutal attack, and DNA testing confirmed his story.

"So why, one might ask, did five innocent teenagers confess to a crime they didn't commit? Perhaps twenty-eight hours of custodial detention, coupled with a host of interrogation techniques were at the root of the teenagers' decision to confess."[9] N. Soree, comment, "When

[9] Indeed, just a few months ago, the Chicago Tribune chronicled the story of two men who, according to recently obtained DNA evidence, falsely confessed to the murder of their children. "After [fourteen] hours of interrogation in a small, windowless room, Kevin Fox simply gave up. He knew

the Innocent Speak: False Confessions, Constitutional

he hadn't sexually assaulted or murdered his [three]-year-old daughter, but police had rejected his requests for a lawyer and told him they would arrange for inmates to rape him in jail, according to court records.

"The distraught father later testified that detectives also screamed at him, showed him a picture of his daughter, bound and gagged with duct tape, and told him that his wife was planning to divorce him, the records show.

"Fox finally agreed to a detective's hypothetical account of how his daughter, Riley, died in an accident, thinking investigators would realize that the phony details didn't match up with the evidence, his lawyer said. Instead, he remained in Will County jail for [eight] months, released only after DNA evidence excluded him as a suspect. In May, another man was charged with the crime.

"What could be a similar story is now unfolding in Lake County, where Jerry Hobbs III . . . is accused of murdering his [eight]-year-old daughter and her [nine]-year-old friend. Hobbs, who had a criminal record, has been in jail five years, in large part because of a confession that emerged after hours of high-pressure interrogation. Prosecutors planned to seek the death penalty in his . . . trial, even though his DNA did not match semen found on his daughter's body.

"Authorities recently matched the DNA with another man accused of rape and robbery in Arlington, [Virginia], offering Hobbs a chance at exoneration and once again raising the possibility that police coerced a suspect to falsely confess.

"Both cases raise a question: Why would [any person] confess to such horrific crimes—especially involving [his] own child or loved one—if [he] didn't commit them? Seemingly unfathomable, it happens far more often than most people believe, experts say." L. Black & S. Mills, "Why Do People Falsely Confess?," Chicago Trib., July 11, 2010, § 1, pp. 1, 12.

The experts that the authors interviewed for this article offer various explanations for false confessions. " 'We know that for certain kinds of people, particularly those with mental illness and mental deficiencies, but other people as well, the psychological intensity of an interrogation can prove absolutely as torturous as physical pain,' said Lawrence Marshall, a Stanford University law professor who co-founded Northwestern University's Center on Wrongful Convictions." Id., p. 12. "Dr. Robert Galatzer-Levy, a psychiatrist on the faculty of the University of Chicago and the Chicago Institute for Psychoanalysis, said interrogations are designed 'not simply to get information,' as the police often portray them. Instead, he said, interrogations are 'well-thought-through psychological manipulations to get a confession.'

"Police do that by first developing a rapport with suspects. They then give them their *Miranda* rights, though in such a way that suspects feel they are being uncooperative if they invoke them. Finally, he said, police confront a suspect, saying they know he committed the crime but offering a way out that acknowledges guilt but to something less heinous.

Safeguards, and the Role of Expert Testimony," 32 Am. J. Crim. L. 191, 194 (2005).

Thus, as one authoritative source has explained, "[s]ocial psychologists, criminologists, sociologists, legal scholars, and independent writers have documented so many examples of interrogation-induced false confession in recent years that there is no longer any dispute about their occurrence. Nevertheless, there is good reason to believe that the documented cases of interrogation-induced false confession understate the true nature and extent of the phenomenon. Most false confessions are not easily discovered and are rarely publicized: they are likely to go unnoticed by researchers, unacknowledged by police and prosecutors, and unreported by the media. As many have pointed out, the documented cases of interrogation-induced false confession are therefore likely to represent only the tip of a much larger iceberg.

"Indeed, the data . . . suggest that interrogation-induced false confession may be a bigger problem for the American criminal justice system than ever before. Although we do not presently know the frequency with which police elicit confessions from the innocent, researchers have discovered and documented far more cases of false confession in recent years than in any previous time period." S. Drizin & R. Leo, "The Problem of False Confessions in the Post-DNA World," 82 N.C. L. Rev. 891, 921 (2004); see id., 891–92 (analyzing "demographic, legal, and case-specific descriptive data from . . . 125 [documented] cases" of interrogation induced false confessions and recommending mandatory elec-

---

* * *

" 'People all say, "I'd never confess. Not in a million years," ' said Galatzer-Levy. 'But it turns out that people who are vigorously interrogated will confess—even if they're innocent. The terrified but rational person might give police a story just to end the interrogation, or because they think it might improve their situation.' " Id.

tronic recording of police interrogations, among other policy reforms, as way to minimize number of false confessions).

It is apparent, therefore, that a recording requirement would dramatically reduce the number of wrongful convictions due to false confessions, and it also would protect against the use of confessions that are involuntary and, therefore, inherently unreliable. Because a confession constitutes such persuasive evidence of guilt, the value of having a recording of that confession and the interrogation that leads to it cannot be overstated.

## II

The majority makes several arguments in support of its rejection of the defendant's claim that this court should adopt a recording requirement under its supervisory powers. They are: (1) this court's supervisory authority is reserved for issues of the " 'utmost seriousness,' "[10] and the issue of whether confessions should be recorded does not rise to that level of importance; (2) the proposed recording requirement falls outside the purview of this court's supervisory authority because it purports to regulate the conduct of nonjudicial officers, namely, the police; (3) the cost associated with recording confessions; (4) the chilling effect that the recording requirement would have on the manner in which the police obtain confessions; (5) the difficulty in establishing the precise parameters of the requirement; and (6) the legislature is better suited than this court to gather and evaluate the facts necessary for determining whether such a recording requirement is warranted. These arguments provide no legitimate basis for rejecting a recording requirement under this court's supervisory authority, and they certainly do not out-

[10] See footnote 1 of this opinion.

weigh the overriding benefits to be derived from such a requirement.

The majority's first assertion, namely, that the issue presented is not sufficiently serious to warrant this court's use of its supervisory powers, cannot withstand even the most cursory examination. Indeed, I submit that there are few issues of greater importance to the perceived fairness and integrity of our criminal justice system than the voluntariness and reliability of confessions. As this court has observed, confessions represent "the most damaging evidence of guilt . . . ." (Citation omitted.) *State* v. *Ruth*, 181 Conn. 187, 199, 435 A.2d 3 (1980); see also *State* v. *Patterson*, 276 Conn. 452, 473, 886 A.2d 777 (2005) ("evidence regarding an accused's admission of guilt generally is extremely important to the state and damaging to the accused"); *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 446, 813 N.E.2d 516 (2004) ("[t]here is no dispute that the evidence of a defendant's alleged statement or confession is one of the most significant pieces of evidence in any criminal trial"); B. Garrett, supra, 62 Stan. L. Rev. 1054–57, 1068–90 (discussing numerous cases of false confessions that represented central evidence at trial, which resulted in conviction). "Studies suggest that police-induced false confessions appear to occur primarily in the more serious cases, especially homicides and other high-profile felonies . . . ." (Internal quotation marks omitted.) B. Garrett, supra, 1065. It therefore is critically important, both to the state and to the defendant, that the fact finder be provided with an accurate depiction of all of the relevant circumstances surrounding the confession. "When there is a complete recording of the entire interrogation that produced such a statement or confession, the fact finder can evaluate its precise contents and any alleged coercive influences that may have produced it." *Commonwealth* v. *DiGiambattista*, supra, 446.

As I discussed previously; see part I of this opinion; this is particularly true in light of the many documented cases of suspects confessing to crimes that they did not commit, for "[i]t is now beyond dispute that the use of psychological interrogation practices, with alarming frequency, has contributed to many false confessions." S. Drizin & M. Reich, "Heeding the Lessons of History: The Need for Mandatory Recording of Police Interrogations to Accurately Assess the Reliability and Voluntariness of Confessions," 52 Drake L. Rev. 619, 634 (2004). "Because confessions are such powerful forms of evidence, the recognition that certain law enforcement strategies can create false confessions should translate into a duty on the part of police to preserve a record of what transpired behind the closed door of the interrogation room." G. Johnson, "False Confessions and Fundamental Fairness: The Need for Electronic Recording of Custodial Interrogations," 6 B.U. Pub. Int. L.J. 719, 743 (1997); see also B. Garrett, supra, 62 Stan. L. Rev. 1059, 1066 (concluding that, "unless interrogations are recorded in their entirety," courts may not discern police practices that lead suspects to confess falsely, such as when police intentionally or unintentionally "contaminate a confession by feeding or leaking crucial facts"); E. Sackman, "False Confessions: Rethinking a Contemporary Problem," 16 Kan. J.L. & Pub. Policy 208, 209 (2006–2007) ("[t]he bulk of the scholarship calls for some sort of mandatory electronic recording of the interrogation procedure" to counteract problem of wrongful convictions based on false confessions). Moreover, it is apparent that Connecticut is not immune from the reality of false confessions. See, e.g., G. Johnson, supra, 722–32 (discussing several suspected cases of false confessions, including some Connecticut cases).

The dismissive view of the majority notwithstanding, it is impossible to ignore the seriousness of the issue.

As the Alaska Supreme Court has explained, "[t]he [prosecutor] usually attempts to show [that a confession was voluntary] through the interrogating officer's testimony that the defendant's constitutional rights were protected. The defendant, on the other hand, often testifies to the contrary. The result, then, is a swearing match between the law enforcement official and the defendant, which the courts must resolve. . . .

"Although there are undoubtedly cases [in which] the testimony on one side or the other is intentionally false, dishonesty is not our main concern. Human memory is often faulty—people forget specific facts, or reconstruct and interpret past events differently.

"It is not because a police officer is more dishonest than the rest of us that we . . . demand an objective recordation of the critical events. Rather, it is because we are entitled to assume that he is no less human—no less inclined to reconstruct and interpret past events in a light most favorable to himself—that we should not permit him to be a judge of his own cause. [Y. Kamisar, "Forward: *Brewer* v. *Williams*—A Hard Look at a Discomfiting Record," 66 Geo. L.J. 209, 242–43 (1977).] . . .

"In the absence of an accurate record, the accused may suffer an infringement [on] his right to remain silent and to have counsel present during the interrogation. Also, his right to a fair trial may be violated, if an illegally obtained, and possibly false, confession is subsequently admitted. An electronic recording, thus, protects the defendant's constitutional rights, by providing an objective means for him to corroborate his testimony concerning the circumstances of the confession." (Citations omitted; internal quotation marks omitted.) *Stephan* v. *State*, 711 P.2d 1156, 1161 (Alaska 1985). Furthermore, "[w]ithout a contemporaneous record of the interrogation, judges are forced to rely

on the recollections of interested parties to reconstruct what occurred [in the interrogation room]. The result is often a credibility contest between law enforcement officials and the [accused], which law enforcement officials invariably win."[11] *In re Jerrell C.J.*, 283 Wis. 2d 145, 170–71, 699 N.W.2d 110 (2005); see also *State* v. *Scales*, 518 N.W.2d 587, 591 (Minn. 1994) (recognizing that trial courts "consistently credit the recollections of police officers regarding the events that take place in an unrecorded interview" and that "[a] recording requirement . . . will reduce the number of disputes over the validity of *Miranda* warnings and the voluntariness of purported waivers"); *State* v. *Cassell*, 280 Mont. 397, 405, 932 P.2d 478 (1996) (Trieweiler, J., concurring) (When police fail to record interrogation, "[t]he trial court, and [the reviewing] [c]ourt, are required to specu-

---

[11] This apparently is no less true in Connecticut. As amicus curiae, the Connecticut Criminal Defense Lawyers Association, notes, since this court's decision in *State* v. *James*, 237 Conn. 390, 428–29, 678 A.2d 1338 (1996), in which we rejected the claim that, under the due process clause of the Connecticut constitution, confessions obtained through police interrogation are inadmissible unless they are recorded, courts regularly, if not invariably, have credited the testimony of the police over that of the defendant in evaluating the voluntariness of a confession. See, e.g., *State* v. *Lapointe*, 237 Conn. 694, 731–33, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); *State* v. *McColl*, 74 Conn. App. 545, 565–66, 813 A.2d 107, cert. denied, 262 Conn. 953, 818 A.2d 782 (2003); *State* v. *Stevenson*, 70 Conn. App. 29, 53, 797 A.2d 1 (2002), rev'd on other grounds, 269 Conn. 563, 849 A.2d 626 (2004); *State* v. *Spyke*, 68 Conn. App. 97, 102–103, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002); *State* v. *Banks*, 58 Conn. App. 603, 614, 755 A.2d 279, cert. denied, 254 Conn. 923, 761 A.2d 755 (2000); *State* v. *Rodriguez*, 56 Conn. App. 117, 119–22, 741 A.2d 326 (1999), cert. denied, 252 Conn. 926, 746 A.2d 791 (2000); *State* v. *Fernandez*, 52 Conn. App. 599, 611–14, 728 A.2d 1, cert. denied, 249 Conn. 913, 733 A.2d 229, cert. denied, 528 U.S. 939, 120 S. Ct. 348, 145 L. Ed. 2d 272 (1999); *State* v. *Rivera*, 52 Conn. App. 503, 509–10, 728 A.2d 518, cert. denied, 249 Conn. 906, 733 A.2d 226 (1999); *State* v. *DaEria*, 51 Conn. App. 149, 167, 721 A.2d 539 (1998). In citing the foregoing cases, I do not suggest that the trial court in each such case did not make the correct decision concerning the admissibility of the confession. Rather, I refer to them simply to underscore the fact that, without a recording requirement, it is exceedingly unlikely that a defendant will be able to establish that his or her confession is unreliable.

late about [the circumstances surrounding the confession and] to weigh the relative credibility of the people involved in the interrogation. Such an unreliable process is inexcusable when it is unnecessary because a means of absolute verification [is] readily available."); D. Donovan & J. Rhodes, "Comes a Time: The Case for Recording Interrogations," 61 Mont. L. Rev. 223, 229–30 (2000) ("A recording minimizes the swearing match between law enforcement and the accused over what actually happened. Experience teaches who wins that match. . . . As [the United States Supreme Court] noted, '[t]here is the word of the accused against the police. But his voice has little persuasion.' [*Reck* v. *Pate*, 367 U.S. 433, 446, 81 S. Ct. 1541, 6 L. Ed. 2d 948 (1961) (Douglas, J., concurring).] Recording will not stack the deck against or favor the defendant. It will make the process fairer. An objective recording cures the effect of the human tendency to recollect events in a self-promoting manner.").

Of course, recordings do not protect only the accused. "[A] recording also protects the public's interest in honest and effective law enforcement, and the individual interests of those police officers wrongfully accused of improper tactics. A recording, in many cases, will aid law enforcement efforts, by confirming the content and the voluntariness of a confession, when a defendant changes his testimony or claims falsely that his constitutional rights were violated." *Stephan* v. *State*, supra, 711 P.2d 1161; see also *Gasper* v. *State*, 833 N.E.2d 1036, 1041 (Ind. App.) ("[t]here can be little doubt that the electronic recording of a custodial interrogation benefits all parties involved"), transfer denied, 841 N.E.2d 190 (Ind. 2005); R. Leo, "The Impact of *Miranda* Revisited," 86 J. Crim. L. & Criminology 621, 692 (1996) ("[E]lectronically recording custodial interrogations promotes the goals of truth-finding, fair treatment, and accountability in the legal process. By

creating an objective and reviewable record of police questioning, [it] further[s] the policy objectives that underlie [the] dual concerns for crime control and due process.").

It is readily apparent, therefore, that the important issue presented by the defendant's claim is precisely the kind of issue that warrants the invocation of this court's supervisory powers. "We ordinarily invoke our supervisory powers to enunciate a rule that is not constitutionally required but that we think is preferable as a matter of policy." *State* v. *Ledbetter*, 275 Conn. 534, 578, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). "Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process"; (internal quotation marks omitted) *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836 (2002); and on the civil side, as well. Thus, this court has exercised its supervisory authority over a wide variety of matters,[12] many of which impli-

---

[12] See, e.g., *State* v. *Ouellette*, 295 Conn. 173, 191–92, 989 A.2d 1048 (2010) (when state attests to witness' cooperation at witness' sentencing hearing, sentencing court must "inquire into the nature of any plea agreement between the state and the witness, and any representations concerning that agreement made during the trials at which the witness testified"); *State* v. *Connor*, 292 Conn. 483, 518–19, 973 A.2d 627 (2009) (upon finding that mentally ill or incapacitated defendant in criminal case is competent to stand trial and to waive right to counsel at that trial, court must make additional determination that defendant is competent to conduct trial proceedings without counsel); *State* v. *Gore*, 288 Conn. 770, 778, 955 A.2d 1 (2008) (when criminal defendant seeks to waive right to trial by jury without written waiver, court must canvass defendant to ensure that waiver is knowing, intelligent and voluntary); *State* v. *Camacho*, 282 Conn. 328, 385 n.38, 924 A.2d 99 (new trial may be ordered due to deliberate prosecutorial impropriety when such impropriety, although not sufficiently serious to constitute due process violation, is so offensive to sound administration of justice that only new trial can effectively deter such misconduct in future), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007); *State* v. *Ledbetter*, supra, 275 Conn. 578–79 (requiring jury instruction concerning certain risks inherent in eyewitness identification procedures); *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005) (reviewing court first must address defendant's insufficiency of evidence claim, if claim is properly

cate considerably less significant issues than the issue

briefed and sufficient record exists, even if another meritorious claim would result in new trial, because, if former claim is successful, new trial would be unnecessary); *Duperry* v. *Solnit*, 261 Conn. 309, 329, 803 A.2d 287 (2002) (when criminal defendant pleads not guilty by reason of mental disease or defect and state substantially agrees with defendant's plea, court must canvass defendant to ensure that plea is voluntary and made with full awareness of consequences); *State* v. *O'Neil*, 261 Conn. 49, 74–75, 801 A.2d 730 (2002) (directing specific version of "Chip Smith" charge); *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002) (prohibiting jury instruction that "one who uses a dangerous weapon on the vital part of another 'will be deemed to have intended' the probable result of that act and that from such a circumstance the intent to kill properly may be inferred"); *Roth* v. *Weston*, 259 Conn. 202, 232, 789 A.2d 431 (2002) (establishing burden of proof in nonparent visitation cases); *State* v. *Griffin*, 253 Conn. 195, 209–10, 749 A.2d 1192 (2000) (prohibiting use of " 'two-inference' " jury instruction); *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999) (prohibiting use of jury instruction that reasonable doubt is not doubt suggested by " 'ingenuity of counsel' "); *State* v. *Schiappa*, 248 Conn. 132, 168, 175, 728 A.2d 466 (prohibiting use of jury instruction that requirement of proof beyond reasonable doubt is rule designed to " 'protect the innocent and not the guilty' "), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *Ireland* v. *Ireland*, 246 Conn. 413, 431–33, 717 A.2d 676 (1998) (adopting factors to be considered in determining best interests of child in cases involving parental relocation); *State* v. *Santiago*, 245 Conn. 301, 340, 715 A.2d 1 (1998) (expanding scope of inquiry required for general allegations of juror misconduct when alleged misconduct results from racial bias of juror or jurors); *State* v. *Coleman*, 242 Conn. 523, 542, 700 A.2d 14 (1997) (upon defendant's request, sentencing court must articulate its reasons for imposing greater sentence after trial than that previously imposed under terms of withdrawn plea agreement); *State* v. *Gould*, 241 Conn. 1, 15, 695 A.2d 1022 (1997) (video-recorded deposition testimony must be played in open court, under supervision of trial judge, and in presence of parties and counsel, rather than in jury room); *State* v. *Brown*, 235 Conn. 502, 528, 668 A.2d 1288 (1995) (when trial judge is presented with allegations of juror misconduct, he or she must conduct preliminary inquiry into such allegations); *State* v. *Breton*, 235 Conn. 206, 250, 663 A.2d 1026 (1995) (special verdict form submitted to jury in capital sentencing case must include brief statement of jury's responsibility for determining whether defendant is sentenced to death); *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995) (bifurcation of jury proceedings in certain death penalty cases); *Bennett* v. *Automobile Ins. Co. of Hartford*, 230 Conn. 795, 806, 646 A.2d 806 (1994) (in cases involving insurance disputes, insurer must raise certain issues of policy limitation by way of special defense); *State* v. *Patterson*, 230 Conn. 385, 400, 645 A.2d 535 (1994) (trial judge must be present in court to oversee voir dire in criminal trial); *State* v. *Holloway*, 209 Conn. 636, 645–46, 553

presented in this case. Consequently, there is no merit to the majority's assertion that ensuring the voluntariness and reliability of confessions is not an important enough matter to justify the exercise of this court's supervisory authority.

The majority next asserts that, because a recording requirement would affect the conduct of nonjudicial actors, that is, the police, adopting such a rule might exceed the proper scope of this court's supervisory powers. This claim also lacks merit. As the Supreme Judicial Court of Massachusetts has explained, "[t]hose opposing the imposition of any requirement that interrogations be recorded contend that, whatever the benefits of recording, it is beyond [a] court's power to regulate the activities of law enforcement [officials], and that attempts to do so would violate the separation of powers. . . . The issue, however, is not what we 'require' of law enforcement [officials], but how and on what conditions evidence will be admitted in . . . [court]. [The court] retain[s] as part of [its] superintendence power the authority to regulate the presentation of evidence in court proceedings. The question . . . is whether and how [the court] should exercise that power with respect to the introduction of evidence concerning interrogations." (Citation omitted.) *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 444–45; see also *In re Jerrell C.J.*, supra, 283 Wis. 2d 168 ("[The petitioner] is not asking [the] court to regulate police practice. Rather, he is requesting a rule governing the admissibility of a . . . confession into evidence. This would not make it illegal for [the] police to interrogate [suspects] without a recording. Instead, it would render the unrecorded interrogations and any resultant written confession inadmissible as evidence in court [under certain

A.2d 166 (establishing procedure to be followed during jury selection when defendant claims that state has peremptorily excluded juror on basis of race), cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

circumstances]."). Indeed, as the Minnesota Supreme Court recently observed in mandating a recording requirement, such a requirement affords appropriate protection to a defendant's constitutional rights and represents "a historical and constitutional function of the judicial branch." *State* v. *Chauvin*, 723 N.W.2d 20, 26 (Minn. 2006); see also *State* v. *Cook*, 179 N.J. 533, 561–62, 847 A.2d 530 (2004) ("The judiciary bears the responsibility to guarantee the proper administration of justice . . . and, particularly, the administration of criminal justice. . . . [The] courts thus have the independent obligation . . . to take all appropriate measures to ensure the fair and proper administration of a criminal trial. . . . [When] such appropriate measures are available, they should be employed to the fullest extent feasible to enhance the fairness of proceedings." [Citations omitted; internal quotation marks omitted.]). Furthermore, "[t]he integrity of [the] judicial system is subject to question whenever a court rules on the admissibility of a questionable confession, based solely [on] the court's acceptance of the testimony of an interested party, whether it be the interrogating officer or the defendant. This is especially true when objective evidence of the circumstances surrounding the confession could have been preserved by the mere flip of a switch.[13] Routine and systematic recording of custodial interrogations [would] provide such evidence, and avoid any suggestion that the court is biased in favor of either party." *Stephan* v. *State*, supra, 711 P.2d 1164.

In light of the nature of the interests involved, the fact that a recording requirement will affect the conduct of the police in no way militates against adopting such

---

[13] "Proponents of recording correctly point out that other critical evidence is ordinarily preserved with far greater care—e.g., crime scenes are photographed or even . . . videotaped, not just described from the witness stand by the responding officers." *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 446 n.22.

a requirement. Indeed, a judicially imposed requirement that is designed to enhance the fairness of our justice system by encouraging certain police practices is hardly unprecedented; although constitutionally mandated, the *Miranda* requirement and our suppression rules also are intended to affect the conduct of the police. Moreover, as I noted previously, a recording requirement will aid both the police and the state by promoting confidence in the reliability of the confessions that the state seeks to introduce into evidence. Finally, as I discuss more fully hereinafter, it has been demonstrated that a recording requirement has no adverse effect on the way in which the police question suspects, and it will not impair their ability to obtain confessions. It reasonably cannot be maintained, therefore, that we should refrain from imposing a recording requirement merely because doing so will affect the way in which the police go about their business.

The majority further asserts that its refusal to adopt a recording requirement is justified due to the financial costs of "purchasing, installing and maintaining [the necessary] electronic equipment" and "training officers on the proper use of [that] equipment . . . ." This contention also is meritless. Many police departments already have the necessary recording equipment but choose to use it only selectively. With respect to those departments that would have to purchase recording equipment, however, the cost of doing so would be extremely modest, and when that cost is considered in light of the substantial benefits, both quantifiable and otherwise, that result from a recording requirement, it is de minimis. "The issue of financial cost . . . has not been identified as a significant obstacle to recording interrogations. To the extent that there are some police departments or law enforcement agencies that do not already have recording equipment, the cost of the equipment is minimal, and that cost is dwarfed by . . . the

costs of having officers spend countless hours testifying at hearings and trials in an attempt to reconstruct the details of unrecorded interrogations." *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 444 n.21. "Experiences in Minnesota, Alaska, and [many] other jurisdictions that now voluntarily record [custodial interrogations] demonstrate that the benefits of such practice greatly outweigh the costs, both real and perceived. [A survey of] 238 law enforcement agencies nationwide . . . [revealed] that '[a] contemporaneous electronic record of suspect interviews has proven to be an efficient and powerful law enforcement tool. Audio is good, video is better. . . . Recordings prevent disputes about officers' conduct, the treatment of suspects and statements they made.' " *In re Jerrell C.J.*, supra, 283 Wis. 2d 168–69. "As is all too often the case, the lack of any recording has resulted in the expenditure of significant judicial resources . . . all in an attempt to reconstruct what transpired during several hours of interrogation conducted [months or years beforehand] and to perform an analysis of the constitutional ramifications of that incomplete reconstruction." *Commonwealth* v. *DiGiambattista*, supra, 440. Indeed, "[t]ens of thousands of hours are spent each year during suppression hearings and trials relating to defense claims of coercion and false confessions." T. Sullivan, Center on Wrongful Convictions, Northwestern University School of Law, "Police Experiences with Recording Custodial Interrogations" (2004) p. 23 n.24, available at http://www.innocenceproject.org/docs/Police_Experiences_Recording_Interrogations.pdf (last visited September 27, 2010). Fewer hearings and trials—a demonstrated consequence of the practice of recording confessions—translate into immediate fiscal savings for law enforcement agencies and courts alike.[14]

[14] The Minnesota Supreme Court took judicial notice of the fact that, since its adoption of a recording rule in 1994 pursuant to its "supervisory authority to [en]sure the fair administration of justice"; *State* v. *Scales*, supra, 518 N.W.2d 592; "fewer cases [had] come before [it] in which a key issue [was]

Approximately twenty-five years ago, the Alaska Supreme Court observed that "the [taking] of breath samples was previously impractical. Now that this procedure is technologically feasible, many states require it, either as a matter of due process or by resort to reasoning akin to a due process analysis. The use of audio and video tapes is even more commonplace in today's society. The police already make use of recording devices . . . when it is to their advantage to do so. Examples would be the routine video recording of suspect behavior in drunk driving cases and . . . the recording of formal confessions." *Stephan* v. *State*, supra, 711 P.2d 1161–62.

If the use of audio and video recording equipment was commonplace in Alaska in 1985, it is positively ubiquitous in Connecticut today. Indeed, there is hardly a teenager who does not have some type of electronic recording device available to him or her at virtually every moment of the day.[15] One need only look to the

whether a suspect [had] waived his or her constitutional rights during interrogation. The apparent reduction in appellate cases challenging *Miranda* warnings and waivers suggest[ed] that *Scales* ha[d] succeeded in providing an objective record to answer the contentious disputes around those issues." *State* v. *Conger*, 652 N.W.2d 704, 707 (Minn. 2002).

[15] According to one study, slightly more than 82 percent of Americans owned cell phones in 2007; see T. Stevens, "82% of Americans Own Cell Phones" (November 14, 2007), available at http://www.switched.com/2007/11/14/82-of-americans-own-cell-phones/ (last visited September 27, 2010); many of which came equipped with some type of camera or video capability. "This is impressive growth from a merely [twenty]-something-year-old industry. Back in 1987, a little over [one] million Americans had cell phones. In 1997, the figure was 55 million. [In 2007, it was] 250 million and climbing. Also climbing is data use on cell phones—in 2006, 22 [million] people subscribed to some sort of high-speed mobile data plan—the kind that lets you use your [cell phone] to surf the [Internet], download music and videos, and send pictures. This is an increase of 600 [percent] over the previous year alone." Id. "Personal computers [similarly] have grown increasingly ubiquitous. Where[as] fewer than 20 [percent] of homes had them in 1992, nearly 60 [percent] did in 2002 . . . ." Christian Science Monitor, "Poverty Now Comes With a Color TV," available at http://articles.moneycentral.msn.com/Investing/Extra/PovertyNowComesWithAColorTV.aspx (last visited September 27, 2010). By 2008, approximately 80 percent of homes in the

Internet to see that we have become a nation of amateur filmmakers, and this is made possible by the existence of inexpensive and easy-to-use video recording technology. The widespread use of such technology eviscerates any assertion that a recording requirement is technologically or financially infeasible. See D. Donovan & J. Rhodes, "The Case for Recording Interrogations," Champion, December, 2002, p. 12 ("[the] availability of a recording device, such as a video camera, is so inexpensive these days that recording should always be required for any and all custodial interrogations"), available at http://www.nacdl.org/public.nsf/championarticles/l0210p12/$File/pg12.pdf (last visited September 27, 2010); T. Sullivan, Center on Wrongful Convictions, supra, p. 24 ("very few [law enforcement agencies that were interviewed in a particular study had] mentioned cost as a burden, and none suggested that cost warranted abandoning recordings"). Indeed, "[w]ith the proliferation of video cameras in [cell] phones and MP3 players, capturing an event on video has never been easier." R. Roy, "Videotape Your Next Traffic Stop: A Good Idea?" (July 13, 2010), available at http://autos.aol.com/article/cops-on-video/ (last visited September 27, 2010). "The tools are now pocket sized, creating a new wrinkle in how we're interacting with everything around us . . . ." Id. This is not to suggest that police interrogations should be recorded on cell phones or MP3 players, although they certainly could

---

United States had a desktop or portable computer. S. Ingram, "About 80% of United States Homes Have a Computer" (January 15, 2009), available at http://www.gadgetell.com/tech/comment/
about-80-of-united-states-homes-has-a-computer/ (last visited September 27, 2010). A 2004 survey conducted on behalf of SBC Communications, Inc., found that 40 percent of American families owned a digital video camera in 2004. AT&T, "National Survey Finds the Internet, Web-Enabled Devices Too Important To Leave at Home During Summer Vacation" (June 8, 2004), available at http://www.att.com/gen/press-room?pid=4800&cdvn=news&newsarticleid=21193 (last visited September 27, 2010). In light of these recent trends in technology, that number no doubt has increased exponentially.

be in exigent circumstances. The point simply is that, in light of technological advances, the majority blinks at reality in concluding that the cost associated with a recording requirement is prohibitive.[16] On the contrary, insofar as some police departments may not already have adequate recording equipment, the costs associated with obtaining it would be very small.

The majority also contends that "[r]equiring the police to record all confessions and interrogations in places of detention *might* severely inhibit the police in pursuing, by constitutionally valid methods, confession evidence"; (emphasis added; internal quotation marks omitted); including the use of trickery and deceit when necessary to induce a confession.[17] This purely speculative argument, which the majority accepts uncritically solely on the basis of the state's unsubstantiated con-

---

[16] As Cornelia Grumman aptly explained in her 2002 editorial for the Chicago Tribune, "[v]ideo cameras cost a few hundred bucks. Sony sells digital video cameras starting at $500 retail. The entire setup, including cassettes, could reach [$1000]. That's cheaper than the alternative financial burden, shelling out millions in civil liabilities for false confessions. DuPage County paid $3.5 million to exonerated [d]eath [r]ow inmates Rolando Cruz and Alejandro Hernandez; Cook County paid $38.5 million to the four released [d]eath [r]ow inmates known as the Ford Heights Four. Cook [County] taxpayers are destined to shell out millions more in legal fees and settlements for mishandling interrogations and confessions of four men wrongfully convicted of murdering medical student Lori Roscetti. Then there are the two young boys initially charged in the Ryan Harris case after their questionable confessions." C. Grumman, Editorial, "No More Excuses. Go to the Tape," Chicago Trib., April 21, 2002, § 2, p. 6; see also id. (debunking the "[d]ozens of excuses, from the picayune to the far-fetched, [that] have been thrown out by police departments terrified by the idea of pulling back the curtain to the interrogation room").

[17] Courts invariably have concluded that interrogation methods involving trickery and deception are permissible unless the technique is so extreme or inappropriate as to render the confession involuntary. See, e.g., *State* v. *Lapointe*, 237 Conn. 694, 731–33, 678 A.2d 942 (rejecting defendant's claim that confession should be suppressed because police falsely told him that his fingerprints had been found on handle of knife used to stab victim, and setting forth cases in which use by police of similarly deceptive tactics was held not to support finding that confession was involuntary), cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

cerns,[18] also is unfounded. In fact, "[a]lthough police officers and prosecutors may fear that [judges and] jurors will condemn many of the psychological ploys caught on tape, this has not proven to be the case."[19] M. Thurlow, "Lights, Camera, Action: Video Cameras

[18] At oral argument, the state remarked that judges and juries might look "askance" at certain lawful police interrogation techniques, and, consequently, the police might be reluctant to employ those techniques with the knowledge that they were being recorded. The state explained: "We want our law enforcement officers to ferret out crime, consistent with due process, to do things we might not do as lawyers and judges. . . . They might have to do things that we might look askance at in hindsight."

[19] In *Miranda* v. *Arizona*, supra, 384 U.S. 436, the United States Supreme Court explained what occurs when the police question a suspect in custody. The court first observed that determining what takes place during such questioning is not always easy, noting that "[t]he difficulty in depicting what transpires at such interrogations," which, as the court noted, frequently take place in a "police-dominated" setting, "stems from the fact that in this country they have largely taken place incommunicado." Id., 445. After noting that police use of "physical brutality" to obtain confessions, although the exception, had not been eliminated completely; id., 446–47; the court further explained "that the modern practice of in-custody interrogation is psychologically rather than physically oriented. . . . [C]oercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. . . . Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms." (Citations omitted; internal quotation marks omitted.) Id., 448. Relying on "various police manuals and texts [that] document procedures employed with success in the past . . . and [that] recommend various other effective tactics"; id.; the court described the various psychological ploys that the police use to extract a confession, including, among other things, isolating the suspect in unfamiliar surroundings; id., 449–50; maintaining an "air of confidence in the suspect's guilt"; id., 450; "minimiz[ing] the moral seriousness of the offense"; id.; and questioning the suspect about the reasons why he committed the crime rather than asking him whether he did it. Id. "[P]atience and perseverance" are described as "the major qualities an interrogator should possess . . . ." Id.

The court quoted one authority as advising that, when the suspect is resistant to cooperating, the questioner "must rely on an oppressive atmosphere of dogged persistence. He must interrogate steadily and without relent, leaving the subject no prospect of surcease. He must dominate his subject and overwhelm him with his inexorable will to obtain the truth. He should interrogate for a spell of several hours pausing only for the subject's necessities in acknowledgment of the need to avoid a charge of duress that

as Tools of Justice," 23 J. Marshall J. Computer & Info. L. 771, 800–801 (2005). Experience demonstrates, rather, that, "[s]hort of physical abuse or prolonged psychological coercion, jurors are likely to accept most police interrogation techniques as standard operating procedure." Id., 801 n.248.

Thus, "[d]espite initial reluctance on the part of law enforcement personnel, actual experience with recording of interrogations has confirmed that the benefits expected from the procedure have indeed materialized, and most of those benefits ultimately inure to the prose-

can be technically substantiated." (Internal quotation marks omitted.) Id., 451. The court also observed that trickery and outright deception are tools available to the interrogator when more traditional tactics prove to be unsuccessful in inducing a confession. See id., 453–54.

The court then summarized what it had discerned about the way interrogations are conducted: "From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must patiently maneuver himself or his quarry into a position from which the desired objective may be attained. When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

"Even without employing brutality, the third degree or the specific stratagems described [previously], the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." (Internal quotation marks omitted.) Id., 455. "It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our [n]ation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from [a] defendant can truly be the product of his free choice." Id., 457–58.

cution, not to the defendant." *Commonwealth* v. *DiGiambattista*, supra, 442 Mass. 443. Indeed, "studies reflect that, notwithstanding initial apprehension and skepticism, law enforcement agencies overwhelmingly endorse the practice of recording interrogations once they have gained experience with it." Id., 443–44 n.20. Thus, as one practitioner with particular expertise in the field has explained, "[o]f the hundreds of experienced detectives to whom we have spoken who have given custodial recording a fair try, we have yet to speak with one who wants to revert to non-recording. They enthusiastically endorse the practice. The words they use vary, but their reasons are so repetitious they seem rehearsed. Over and over we have been told that recordings protect officers from claims of misconduct, and practically eliminate motions to suppress based on alleged police use of overbearing, unlawful tactics; remove the need for testimony about what was said and done during interviews; allow officers to concentrate on the suspects' responses without the distraction of note taking; permit fellow officers to view interviews by remote hookup and [to] make suggestions to those conducting the interview; disclose previously overlooked clues and leads during later viewings; protect suspects who are innocent; make strong, often invincible cases against guilty suspects who confess or make guilty admissions by act or conduct; [and] increase guilty pleas . . . ." T. Sullivan, "The Time Has Come for Law Enforcement Recordings of Custodial Interviews, Start to Finish," 37 Golden Gate U. L. Rev. 175, 178–79 (2006).

Indeed, "[t]he law enforcement personnel who oppose recording custodial interviews are almost invariably those who have never attempted to do so. They speculate about potential, hypothetical problems, whereas those who have recorded for years do not express similar misgivings.[20] The [response] . . . from

[20] Another reason sometimes "advanced by police for their frequent failure to electronically record an entire interrogation is their claim that recordings

experienced officers in all parts of the United States [is] heavily weighted (almost unanimously) in support of recording custodial interrogations in felony investigations from the time the *Miranda* warnings are given until the suspect leaves the room." T. Sullivan, Center on Wrongful Convictions, supra, p. 18; see also B. Garrett, supra, 62 Stan. L. Rev. 1114 n.364 (citing to recent survey of 631 investigators in which 81 percent of investigators surveyed "believed that interrogations should be recorded"). In fact, experience indicates that "the majority of agencies that videotape found that they were able to get *more* incriminating information from suspects on tape than [that obtained during] traditional interrogations."[21] (Emphasis added; internal quotation

tend to have a 'chilling effect' on a suspect's willingness to talk." *Stephan* v. *State*, supra, 711 P.2d 1162. This concern is unfounded. In every jurisdiction that has implemented a recording requirement, a suspect's refusal to talk while being recorded constitutes an exception to the requirement such that, in the event that a suspect is unwilling to speak to the police if his or her statements are recorded, the requirement does not apply.

[21] I note that, at the time *Miranda* was decided, critics of the court's holding expressed the concern that advising suspects of their rights, including the right to remain silent, prior to custodial interrogation would severely impede police investigations. See, e.g., M. Cloud et al., "Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects," 69 U. Chi. L. Rev. 495, 496 and n.5 (2002). That concern has proven to be unfounded. "Statistical analyses conducted by *Miranda*'s critics and supporters indicate that waivers are secured in an overwhelming majority of custodial interrogations . . . ." Id., 497; see also S. Chanenson, "Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches," 71 Tenn. L. Rev. 399, 442 (2004) (noting that approximately 84 percent of suspects who have been advised of their rights in accordance with *Miranda* nevertheless waive their right to remain silent and comply with request for statement). Similarly, in *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 229–32, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), the United States Supreme Court declined to adopt a rule requiring that suspects be informed of their right to withhold consent to an officer's request to conduct a warrantless consent search because, among other reasons, the court was concerned that requiring such a warning could jeopardize the continued viability of consent searches. These concerns also appear to have been misplaced, however, because empirical studies indicate that individuals give consent at roughly the same rate regardless of whether they are informed of their right to refuse consent. See, e.g., I. Lichtenberg, "*Miranda* in Ohio: The Effects of *Robinette* on the

marks omitted.) T. Sullivan, Center on Wrongful Convictions, supra, p. 22; see also B. Garrett, supra, 1115 ("most commentators view video [recording] as advantageous to law enforcement, capable of rendering confessions more convincing . . . assisting prosecutors in negotiating more acceptable plea bargains . . . and helping in securing convictions" [internal quotation marks omitted]); M. Thurlow, supra, 23 J. Marshall J. Computer & Info. L. 811 ("[p]rosecutors have found that [video recording] interrogations and confessions results in more guilty pleas and more severe sentences"); M. Thurlow, supra, 810 (citing finding of study that electronic recording did not interfere with police officer's use of standard interrogation techniques); L. Oliver, note, "Mandatory Recording of Custodial Interrogations Nationwide: Recommending a New Model Code," 39 Suffolk U. L. Rev. 263, 263 (2005) ("[c]ontrary to stated concerns, in jurisdictions that routinely record interrogations, recording has not led to a decrease in confessions or productivity"). The experience of Connecticut police officers is no different. Among those who participated in this state's recent recording pilot program,[22] *100 percent* reported that the use of

'Voluntary' Waiver of Fourth Amendment Rights," 44 How. L.J. 349, 370, 373 (2001) (study demonstrated that between approximately 75 and 95 percent of motorists agree to police search of vehicle and that rates were very similar regardless of whether motorists were apprised of their right to refuse such consent, and, consequently, assertion of court in *Schneckloth* that such advisement would jeopardize continued viability of consent searches was "[c]learly . . . unfounded"); M. Phillips, note, "Effective Warnings Before Consent Searches: Practical, Necessary, and Desirable," 45 Am. Crim. L. Rev. 1185, 1201 (2008) (citing study demonstrating that approximately 88 percent of motorists agree to consent search after being advised verbally and in writing of right to refuse consent).

[22] In 2008, the legislature enacted Public Acts 2008, No. 08-143, § 2 (P.A. 08-143), which, among other things, directed the advisory commission on wrongful convictions (advisory commission) "[to] monitor and evaluate the implementation of . . . [a] pilot program to electronically record the interrogations of arrested persons . . . ." Pursuant to P.A. 08-143, § 2, the advisory commission was "[to] report its findings and recommendations to the [judiciary] committee of the General Assembly" no later than January

recording equipment did not interfere *in any way* with their questioning of suspects or the outcome of interrogations.[23]

Finally, even if there were some factual or experiential basis for the majority's assertion that a recording requirement might inhibit police with respect to the techniques they use in obtaining confessions, "[t]his is an unacceptable objection. . . . [L]aw enforcement personnel [are expected] to give complete and truthful testimony, including candid descriptions of what occurred during custodial interrogations. Surely [it is] not suggest[ed] [that police] should be free to modify or omit facts when testifying under oath about what happened during unrecorded interviews." T. Sullivan,

---

7, 2009. In February, 2009, the advisory commission issued its report, finding that, as of January 29, 2009, ninety-nine custodial interrogations had been conducted in four pilot program cities or towns (Bridgeport, Meriden, Southington and Waterford) and that the vast majority of law enforcement personnel involved in the program reported a positive experience, although a small number were neutral on the program. See Advisory Commission on Wrongful Convictions, State of Connecticut, Report Pursuant to Public Act 08-143 (February, 2009) appendix B, available at http://www.jud.ct.gov/committees/wrongfulconviction/wrongfulconvictioncomm_report.pdf (last visited September 27, 2010). Further, each and every one of the participating detectives or officers reported that the use of recording equipment did not interfere in any way with their questioning of suspects or the outcome of the interrogations. Id. These findings mirror the overwhelmingly favorable experiences of the law enforcement agencies around the country that previously have implemented—either voluntarily or pursuant to legislative or judicial mandate—a recording requirement.

[23] Despite the success of the pilot program, the state division of criminal justice opposes legislation mandating a recording requirement. In its view, each police department should be permitted to consider the results of the pilot program and to decide for itself whether to adopt a policy of recording interrogations. See, e.g., Testimony in Opposition of Senate Bill No. 230 (March 10, 2010), available at http://www.ct.gov/csao/cwp/view.asp?A=1802&Q=456774 (last visited September 27, 2010). Kevin Kane, the chief state's attorney, testifying on behalf of the state division of criminal justice, stated that, although "the recording of interrogations might be a desirable investigative practice that is to be encouraged, such recording is not a requirement under the constitutional guarantee of due process" and suggested, therefore, that such a practice should not be mandatory.

Center on Wrongful Convictions, supra, pp. 22–23. Furthermore, to the extent that the state may be concerned that, in any particular case, the jury might not appreciate that the interrogation techniques used by the police were legitimate and permissible, the state presumably would be free to elicit testimony that those techniques are commonly employed by the police and to request an instruction advising the jury that the police properly may employ such techniques as long as those techniques do not render the confession involuntary.

The majority further contends that this court should refrain from adopting a recording requirement because of the purported difficulty in establishing the parameters of any such rule. Of course, not all states that mandate the recording of interrogations take precisely the same approach with respect to the requirements of the rule, including which portions of the interrogation procedure must be recorded[24] and the consequences when the police fail to comply with the rule.[25] In contrast to the majority, I would not describe these different approaches as representing a "panoply of options" illustrating "the complexity of this issue," nor would I conclude, as the majority does, that these relatively minor

---

[24] "For example, Minnesota requires that all custodial interrogations, including any information about rights, waiver of those rights, and all questioning, be recorded electronically when feasible and whenever questioning occurs at a place of detention. *State* v. *Scales*, supra, [518 N.W.2d 592]. In contrast, New Hampshire does not require a recording of the administration of a defendant's *Miranda* rights or the defendant's subsequent waiver of those rights, but it does require a complete recording following the waiver of a defendant's *Miranda* rights. *State* v. *Barnett*, [147 N.H. 334, 338, 789 A.2d 629 (2001)]." *Clark* v. *State*, 374 Ark. 292, 304, 287 S.W.3d 567 (2008).

[25] In many jurisdictions, the failure to record a confession as required results either in the exclusion of the confession; see, e.g., Texas Code Crim. Proc. Ann. art. 38.22, § 3 (a) (Vernon 2005); *Stephan* v. *State*, supra, 711 P.2d 1163–64; *State* v. *Scales*, supra, 518 N.W.2d 592; or a rebuttable presumption of involuntariness, which the state can overcome by establishing, under the totality of the circumstances, that the confession or statements were voluntary and are reliable. See, e.g., D.C. Code Ann. § 5-116.03 (LexisNexis 2009); 725 Ill. Comp. Stat. Ann. § 5/103-2.1 (b) (1) (West 2006).

differences justify doing nothing. Certain approaches appear to be more consistent with the purposes of the rule and therefore advance those purposes to a greater degree than others. Thus, it seems clear that the entire interrogation, including the advisement of rights, should be recorded, primarily to avoid any dispute about that issue. See, e.g., *State* v. *Cook*, supra, 179 N.J. 558 ("[A]dvocates of recording stress that the entire interrogation session must be recorded to achieve the positive benefits of recordings. . . . To create a detailed and complete record . . . recording must begin with the initial contact, including the *Miranda* warnings and any waiver of *Miranda* rights." [Citation omitted.]). It also is apparent that the failure of the police to comply with the recording requirement should result in the exclusion of the confession, with exceptions, of course, when equipment fails or the suspect refuses to be recorded. To conclude otherwise would enable the police to avoid the recording requirement without any real disincentive for doing so; in such circumstances, the state merely would have to establish that the confession was not involuntary, the same standard that presently applies to the admission of confessions.

Finally, the majority argues that the legislature, not this court, should decide whether to adopt a recording requirement in this state. Of course, the legislature has every right to make that decision, and, in fact, it has considered proposals for such a requirement since at least 1996.[26] Because the important issue presented by this case implicates the admissibility of evidence in our

---

[26] Since 1996, the judiciary committee has considered a number of bills that would have required electronic recording of custodial interrogations; see, e.g., Senate Bill No. 230 (2010); Senate Bill No. 608 (2008); House Bill No. 1281 (2005); House Bill No. 6631 (1999); House Bill No. 5490 (1996); only one of which made it out of committee. The bill that made it out of committee, namely, House Bill No. 6631, was not acted on by the full legislature. Because these proposed bills never were considered by the full legislature, no inference can be drawn that the bills were rejected on their merits. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 526 n.14, 949 A.2d 1092 (2008)

trial courts, this court, no less than the legislature, has the expertise and the authority to decide whether such a recording requirement should be adopted in the interests of justice. See, e.g., *State* v. *DeJesus*, 288 Conn. 418, 451, 953 A.2d 45 (2008) (noting that this court has "inherent authority to change and develop the law of evidence through case-by-case common-law adjudication"); id., 462 ("[b]ecause the rules of evidence facilitate the court's core judicial truth-seeking function, they necessarily are, and always have been, subject to the oversight and supervision of this court both under the common law and under article fifth, § 1, of the state constitution"). Indeed, in the absence of any express direction from the legislature, we have a constitutional responsibility to address and resolve the issue. On the merits of the question, the answer is crystal clear: there is no basis for rejecting a recording requirement, and there are overriding reasons to adopt one.[27]

(court ordinarily draws no inference that legislature perceived bill as lacking in merit when bill never was reported out of committee).

[27] Of course, as this court has recognized, "the rules of evidence . . . have never in this state been regarded as exclusively within the judicial domain. Over a period of many years, the legislature has enacted various statutes modifying the rules of evidence prevailing at common law . . . . *These changes have been accepted by our courts and have never been challenged as violating the principle of separation of powers.*" (Emphasis added.) *State* v. *James*, 211 Conn. 555, 560, 560 A.2d 426 (1989); accord *State* v. *DeJesus*, supra, 288 Conn. 462 n.31. Because the issue of whether to impose a recording requirement involves an important issue of public policy, and not merely an issue pertaining to the orderly dispatch of judicial business in our courts, there is no reason why the legislature would not be free to alter or even to abolish any such requirement that this court might adopt. See *State* v. *James*, supra, 560; see also *McDougall* v. *Schanz*, 461 Mich. 15, 30–31, 597 N.W.2d 148 (1999) (statutory rule of evidence violates state constitutional separation of powers principles only when "no clear legislative policy reflecting considerations other than judicial dispatch of litigation can be identified," and, therefore, "[i]f a particular court rule contravenes a legislatively declared principle of public policy, having as its basis something other than court administration . . . the [court] rule should yield" [internal quotation marks omitted]). Consequently, there is no reason why this court should decline to consider the issue merely because the legislature also has an interest in it.

The majority nevertheless asserts that, because the legislature has not taken any action in response to the report recounting the success of the

## III

Despite the majority's unwillingness to do so, it is time for this court to impose a recording requirement with respect to police interrogations of suspects that occur at a police station.[28] It is unacceptable, if not unconscionable, to continue to permit the police to choose when they will record an interrogation. As I have explained, a recording requirement would greatly enhance the ability of the fact finder to evaluate the voluntariness and reliability of a confession, thereby guarding against the use of false and coerced confessions and promoting public trust and confidence in the justice system.[29] Thus, there is a great deal to be gained

pilot program for the recording of interrogations; see footnote 22 of this opinion; it would constitute "a potential usurpation" of the legislature's prerogative in this area for this court to adopt a recording requirement. Footnote 13 of the majority opinion. On the contrary, this court and the legislature share authority in such matters, and there simply is no reason for this court to decline to exercise its reasoned judgment on the issue because, as I have explained, if the legislature ultimately were to conclude that a recording requirement is not warranted, it would be free to abolish any such requirement that this court has imposed.

[28] I note that an increasing number of courts have been persuaded to adopt a recording requirement. For example, in September, 2009, the Indiana Supreme Court expressly found that "the interests of justice and sound judicial administration will be served by the adoption of a new [r]ule of [e]vidence to require electronic audio-video recordings of customary custodial interrogation of suspects in felony cases as a prerequisite for the admission of evidence of any statements made during such interrogation." Indiana Supreme Court, Order No. 94S00-0909-MS-4 (September 15, 2009) (adopting rule 617 of the Indiana Rules of Evidence, which precludes admissibility of unrecorded confessions with certain exceptions), available at http://indiana-lawblog.com/documents/Evidence%20Rule%20617s.pdf (last visited September 27, 2010); see also, e.g., *Clark* v. *State*, 374 Ark. 292, 302, 304, 287 S.W.3d 567 (2008) (rejecting defendant's claim that recording of custodial interrogation was constitutionally mandated but concluding that "criminal-justice system will be better served if [the court's] supervisory authority is brought to bear on this issue"); *In re Jerrell C.J.*, supra, 283 Wis. 2d 173 (exercising supervisory authority to adopt rule requiring recording of custodial interrogation of juvenile suspects).

[29] The majority characterizes this concurrence as an "impassioned plea for the point that no one in the majority disagrees with, namely, that the recording of confessions is desirable as an aid in evaluating the reliability and trustworthiness of confessions [and would] increase the accuracy and

by a recording requirement, with no adverse consequences to law enforcement.

Nevertheless, in the present case, the failure of the police to record the defendant's interrogation was harmless; as the record makes clear, the evidence of the defendant's guilt was overwhelming and included the testimony of two eyewitnesses who observed the defendant commit the crimes of which he was convicted. Accordingly, I respectfully concur insofar as the majority affirms the judgment of conviction.

efficiency of judicial proceedings . . . ." Footnote 13 of the majority opinion. The majority's expression of support for a recording requirement is difficult to square with the myriad of reasons it offers for rejecting such a requirement. Moreover, the majority misapprehends the purpose of this opinion in asserting that the point of it is to demonstrate the desirability of a recording requirement. My point, rather, is to demonstrate *why this court should adopt such a requirement,* a position with which the majority fundamentally disagrees.

  